[No. 6433. Decided October 26, 1906.]

THE STATE OF WASHINGTON, *Respondent*, v. HERBERT DILLEY *et al.*, *Appellants*.[1]

INDICTMENT AND INFORMATION—FURNISHING COPY. Error cannot be predicated upon failure to furnish the defendants with a copy of the information, after plea thereto and announcement that they were ready for trial, without any demand therefor or objection to the trial.

CRIMINAL LAW—ROBBERY—EVIDENCE OF CONSPIRACY. Upon a joint prosecution for robbery under claim that a conspiracy existed between defendant D. and the other defendants, conversations between D. and the prosecuting witness, had while the other defendants were not present, are properly admitted in evidence against D., and against the others if further evidence should show concerted action between them.

SAME—EVIDENCE OF CONCERTED ACTION—SUFFICIENCY. There is sufficient evidence of concerted action on the part of defendants, jointly prosecuted for robbery, to admit evidence of conversations had with one of the defendants while the others were not present,

[1]Reported in 87 Pac. 133.

where it appears that by such conversations the prosecuting witness was lured to the home of the defendants where he was attacked and robbed by all of the defendants actively participating therein.

SAME—LETTERS—ADMISSIBILITY. In such a case, a letter written by one of the conspirators suggesting the line of evidence to be used by the two other defendants on the defense of the writer, which letter fell from her room, is sufficiently identified from its contents without proof of the handwriting or signature, and it is admissible against the other defendants in case attempted correspondence was going on between them at the time, and the other defendants were concerned in the offense, although the letter alone was not sufficient evidence of the conspiracy.

SAME—EVIDENCE OF CONSPIRACY. In such a case there is sufficient *prima facie* evidence of a conspiracy to necessitate the submission of the question to the jury.

Appeal from a judgment of the superior court for Lewis county, Rice, J., entered April 7, 1906, upon the trial and conviction of the defendants jointly charged with the crime of robbery. Affirmed.

*Maurice A. Langhorne* and *Forney & Ponder*, for appellants.

*J. R. Buxton* and *A. J. Falknor*, Assistant Attorney General, for respondent.

HADLEY, J.—The defendants in this cause were jointly charged with the crime of robbery, and were also jointly tried. A verdict of guilty was returned. Each defendant was sentenced to serve a term of six years' imprisonment in the state penitentiary, and they have all appealed.

They first complain that neither they nor their attorneys were furnished with a copy of the information, as required by Bal. Code, § 6880 (P. C. § 2132). No demand or request was made for a copy of the information, and no objection was made to going to trial without it. Appellants had appeared to the information both by demurrer and by pleas. They had demanded separate trials and afterwards withdrawn the demand. They had announced themselves ready

for trial, and then merely stated that they wished the record to show that they had not been served with a copy of the information. Having announced themselves ready for trial when the case was called, and not having actually objected to going to trial without the copy, they cannot now be heard to urge, after conviction, that they were prejudiced. *Diffin v. State* (Tex. Cr.), 63 S. W. 128; *State v. Green*, 66 Mo. 631; *State v. Jackson*, 12 La. Ann. 679.

The theory of the state in the presentation of its testimony was that a conspiracy existed between all of the appellants to rob the complaining witness, and it is urged by appellants that the court erred in admitting evidence concerning the acts and declarations of one appellant committed or made when not in the presence of the others. It is conceded that direct and positive evidence of a formal agreement between conspirators is not required, and that a conspiracy is usually established by proof of facts and circumstances from which an unlawful combination may be inferred. It is, however, urged that there was not proof of facts and circumstances in this case from which a conspiracy could be inferred. Objections were made to evidence concerning conversations between appellant Alice Dilley and the prosecuting witness, not occurring in the presence of the other appellants. When ruling upon the admission of this testimony the court said:

"I think I will rule this way: That her statements made at that time, if she made any, are competent evidence against her at this time. But as to whether or not it constitutes any evidence against the other two defendants depends upon whether or not the proof shows that there was concerted action between all three of the defendants."

We think this was manifestly the correct ruling at the time. The conversations were certainly admissible as against Mrs. Dilley, and as the state could not introduce its whole chain of evidence at one time, it remained to be seen whether such

14—44 WASH.

facts would appear as would make it admissible against the coappellants. The parties were being tried jointly, and such evidence as was admissible against one of them was properly admitted, its applicability to the others to be thereafter controlled by proper instructions when all the evidence was introduced. For convenience the acts and declarations of one are admitted before sufficient proof of a conspiracy is given, the state undertaking to furnish such proof at a subsequent stage of the cause. 1 Greenleaf, Evidence (16th ed.), § 184a; *State v. Winner*, 17 Kan. 298; Underhill, Criminal Evidence, § 494.

Complaint is, however, made that sufficient facts at no time appeared to make these conversations admissible as against the coappellants, and that the court refused to so instruct the jury. There was testimony as to the following facts: The appellants Dilley were husband and wife, and appellant Carland was an acquaintance of the two. The Dilleys lived in the city of Centralia in a sparsely populated district, about a mile from the city hall. The prosecuting witness, Alderman, was at that time night marshal of said city. On the night of January 23, 1906, Alderman was in attendance at a meeting of the city council at the city hall. About ten o'clock he was called outside of the room by a messenger sent to him by Mrs. Dilley. On going out he saw Mrs. Dilley, who had with her her little baby in a baby carriage. She told him her husband was away at work at Martin's mill, and that she desired Alderman to accompany her home. He told her that Mr. McFarland, who was present and who was the messenger above mentioned, would go with her as he, Alderman, desired to remain at the meeting of the city council. To this she objected, saying she did not know McFarland, and that she wished Alderman to go with her. Thereupon Alderman consented to go, and did go with her to her home. The night was rainy, and a part of the way is described as a "lonely walk." The road for some distance was

along the railroad track and many side tracks crowded with freight cars, a place which Alderman said he regarded as dangerous for a woman to be alone at night.

Soon after they started Mrs. Dilley stepped into a restaurant, as she said, to get a drink of water. Alderman remained outside and did not watch her. He does not know what she did during the one or two minutes she was gone. There was also evidence that her husband and Carland were together around town that evening, and that Dilley was not working at Martin's mill. After she came out of the restaurant she and Alderman proceeded, he wheeling the baby carriage after they had reached the railroad track. About that time she asked him if he had sold his livery barn. He told her he had, and she then asked him if he did not get a pretty good price, to which he replied that he received a fair price. She also asked him where he carried his gun, and he told her that he carried it in his right-hand outside coat pocket. As they approached her house, she said she was afraid to go into the house alone, as there had been a number of "hoboes" around, and asked if he would go in with her. He consented to do so. She opened the door and he went in, taking the baby carriage up the three steps into the house. She asked him to sit down, when he told her he was in a hurry to get back, but that he would like a drink of water. She said she would get him a drink, and he sat down to wait until she did so.

When they entered the house a small burning lamp was sitting to the left of the door, which she immediately removed to a stand across in another corner of the room. After sitting for a moment or two, he heard the bedroom door open, which had before stood ajar about two inches, and Dilley and Carland rushed from the room. The door was about four feet from where he sat, and the lamp above mentioned was near his location before it was removed. They hit him with their fists and held him, and Mrs. Dilley came rushing

from behind some hanging curtains and, putting her hand into his outside coat pocket, grabbed his gun and said, "Boys, I have got his gun." Dilley took the gun and drew it upon Alderman, saying: "I have got you. I will fix you for running around with my woman." Alderman further says:

"Then he said: 'Do you know what I am going to do with you?' and I said: 'No.' He says: 'Take off that coat and vest,' and I said: 'I would not get rash or do anything like that.' And he says: 'Take it off or I will shoot your heart out in a minute.' I took it off, thinking I might get some show in taking it off. I had a billie in my pocket—a club—and I thought I might get some show to get at that, but he held the gun on me very close and told me: 'If you make a move I will kill you.' So I takes them off and Carland takes the clothes and went through them as I takes them off."

After they required him to remove his clothes, and after they had taken everything from his pockets, Alderman says:

"He said: 'Do you know what I am going to do with you?' and I said: "No." Then with an oath he said: 'I am going to make you go down town just in the shape that you are now in;' and I said: 'No, that is where you are wrong; you can't do that. You may kill me, but you cannot do that.' With that he came at me with the knife, hollowing to Red to come on too. Well, they had a scuffle just a short time with me. They made several slashes at me, cut me over the eye in the head here, made a slash at my neck, and I grabbed the knife with my left hand. It just grazed my neck; just cut through the hide. It was a butcher knife. It cut all the leaders in this hand. I threw out my hand and caught the knife, but I could not hold it, and it dropped to the floor, and Mrs. Dilley jumps and grabs the knife, hollowing, says: 'Don't kill him,' and Dilley jumps back and throws the gun on me again and says: 'If you make a move I will kill you.' . . . Then he says: 'There is just one way that you can get out of this,' and I says: 'Boys, it is up to you.' He says: 'Dig up two hundred dollars.' I says: 'I haven't got it. You went through my clothes and you see I haven't got it in my clothes, but if you will let me come down

town I think I can get you the money.' He wanted to know where I could get it, and I told him I thought at McGrail's. He says: 'All right.' They let me put on my clothes except my pants. They took the suspenders off these pants, and they gave me a pair of Dilley's pants. Red put the suspenders on for me and fixed them, and then we started down town, with Carland holding on to my arm and Dilley walking behind me, and said: 'If you make a crooked step, if you make any move, I will kill you just the same as I would a dog.' In going down he said: 'You sold your barn. Did you get a pretty good price for it?' I says: 'I got a fair price for it.' He says: 'Can't you give me a check?' And I said: 'I have got no check, and I have got no money. I cannot give you a check.' And he says: 'Well, you dig it up somewhere,' and I says: 'I guess I can get it all right as soon as I can get down town.' We went on down to town and into McGrail's saloon, and Tom was in there."

McGrail, the proprietor of the saloon, expressed surprise at the appearance of Alderman, and asked him what was the trouble. Alderman asked him if he could give him $200, "at the same time giving him the wink." McGrail insisted upon talking to Alderman alone in another room. After he had told McGrail what had occurred, the latter, with Alderman, following him, returned to the saloon and thereupon both Dilley and Carland ran away. Later during that night, all three of the appellants were arrested at the Dilley home, and were all sleeping in the same room.

We have made the above extended statement of facts appearing in evidence in order to show whether there were concurring facts to indicate a concerted purpose between all the appellants to rob the prosecuting witness, and such facts as were sufficient for submission to the jury upon that subject. We believe the statement of the evidence itself shows that there was sufficient concerted action shown for submission to the jury, and that no further argument is required upon the subject. That the complaining witness was robbed there could have been no doubt under the evidence submitted

by the state.  Valuable property was taken from him forcibly, by violence and by putting in fear.  All the appellants actively participated in the consummated act, and it was a question for the jury whether the acts and declarations of Mrs. Dilley were in furtherance of a common design.  Wharton, Criminal Evidence (9th ed.), § 698, and cases cited. It was not error therefore to admit evidence of the acts and declarations of Mrs. Dilley as against the other appellants, in view of all the evidence.  And it was not error to refuse to instruct the jury unconditionally that such acts and declarations could in no event be considered against her coappellants.

It is, however, urged that in any event the court erred in admitting in evidence a certain letter, and especially in permitting the jury to consider it without an instruction to exclude it from their consideration except as against Mrs. Dilley.  It was the theory of the state that the letter was written by Mrs. Dilley to be received by her husband.  It began as if especially intended for "Kid," who is frequently addressed in the second person, and it also made reference to "Red," these being nicknames by which Dilley and Carland were respectively called.  The contents showed without doubt that the writer referred to what had occurred between Mrs. Dilley and Alderman on the night of the alleged robbery, and also to what occurred at the Dilley home when all the appellants were present.  It contains suggestions as to what statements should be made in order to harmonize with statements which had been made by the writer.  The references to the first person as the writer could have been to no other than Mrs. Dilley and to her relation to the circumstances heretofore detailed.  It contains suggestions that the writer had told others that "he," not naming any one, had sought improper relations with her, and that "you boys came out of that closet and that you boys were in there unknown to me, and you want to say that Red was sitting up

by the stove when they came that morning after us." It also contained the following:

"Kid, don't get mad over the note I sent you this morning. Kid, I told them that I did not know there was any knife in it until it was all over with and I picked it up off the floor myself, and Red picked the gun up. . . . Kid, don't say anything to that nigger now for he will switch on us writing these notes. Keep still and write me notes just the same."

The letter was long and contained matter unfit for insertion here. It will be seen that the letter referred to a previous correspondence with the person addressed, but there was no other direct proof that such correspondence had taken place. Mrs. Dilley was confined alone in an upper room in the jail building, her coappellants being confined below. The letter was seen falling directly from the window of Mrs. Dilley's room, and was immediately secured and kept until the time of the trial. It was not signed by any one, and there was no identification of the handwriting. Objection was made to it in behalf of Mrs. Dilley, on the ground that the handwriting had not been proved. However, it fell directly from her room, and it was shown that there was no other person there at the time. We think these circumstances were sufficient to connect her with it without an actual identification of the handwriting, and that it was properly admissible as against her.

Further objection was made to the letter in behalf of Dilley and Carland, on the ground that it had not been shown that communication was invited by them; that as to them it was hearsay and incompetent, for the reason that, if there was any conspiracy, it was closed before the letter was written, and that the admissions or declarations of a coconspirator made after the termination of the conspiracy, not in the presence of the others, are inadmissible. The court ruled that the letter should be received at that time as evidence

against Mrs. Dilley, and at the same time instructed the jury that it was not to be considered as evidence against the others unless they should find from all the evidence that about that time a correspondence or attempted correspondence was going on between the appellants, and that the two male appellants were concerned therein, in which case it would become evidence against all three of them. It is urged that there was at no time proof of such correspondence other than the letter itself, and that the court should, in any event at the close of the evidence, have expressly excluded the letter from the jury's consideration as against Dilley and Carland.

We think sufficient facts appeared in evidence for submission to the jury as to a common design or conspiracy not only to rob the complaining witness, but also to fabricate a defense as an excuse for the conduct of appellants. The evidence of what occurred at the Dilley home showed a purpose to assert that Alderman had accompanied Mrs. Dilley to her home with an improper purpose, for which her husband sought reparation, and that theory was maintained at the trial by the appellants. If such was the conspiracy it did not end with the commission of the alleged robbery, but it extended to the time of the trial, and was pending when the letter in question was written. On that theory it was not error for the letter to go to the jury as against all the appellants, even though the court may have submitted it to them on the theory that there was evidence of an actual correspondence. In cases where the conspiracy comprehends not only the actual offense committed, but from the beginning extends to and includes a common design or scheme to fabricate a defense, it is held that the conspiracy continues to exist, even after the principal act is done, and that the declarations of one coconspirator made under such circumstances and in furtherance of such design, are admissible as against all, though made subsequent to the principal act. In *Miller v. Dayton*, 57 Iowa 423, 10 N. W. 814, the court said:

"It is claimed that if any conspiracy was entered into it terminated with the killing of Miller, and that the evidence of any act or declaration of Jefferson Dayton subsequent to that time is inadmissible. If, as claimed, however, the conspiracy also had for its purpose to prevent suspicion from attaching to the defendant, and not fully completed when Miller was killed. . . . Whatever the defendant himself may have done, in the fabrication of evidence to prevent suspicion from attaching to him, or to avoid a prosecution, was proper to be shown to the jury, and considered by them, . . . And if another person conspired with him, to assist in the accomplishment of this purpose, his acts and declarations, in furtherance of the common design are, we think, admissible."

See, also, *People v. Mol*, 137 Mich. 692, 100 N. W. 913, 68 L. R. A. 871; *Scott v. State*, 30 Ala. 503.

The letter was admissible as tending to establish the existence of a conspiracy not only to rob the complaining witness, but also to fabricate testimony to conform to a theory for defense. The letter itself was not sufficient to establish a conspiracy, but when taken in connection with the other evidence in relation to an actual robbery, it was competent as tending to show the general design of the conspirators. There was sufficient *prima facie* evidence of a conspiracy, and it then became a question for the jury to say whether there was in fact a conspiracy.

"It is insisted that the court erred, in the instruction above set out, in leaving the jury to determine whether a conspiracy existed. It is claimed that that question must be determined by the court. It is true, the court must determine, in the first instance, whether there is sufficient *prima facie* evidence of a conspiracy to justify the submission to the jury of the acts and declarations of an alleged conspirator as evidence against his fellows. But, ultimately, it is for the jury to determine whether, upon the whole testimony, any conspiracy has been shown; and if they find that no conspiracy has been established, it is then their duty not to consider the acts and declarations which have been admitted of a supposed conspirator." *Miller v. Dayton, supra.*

A number of errors are assigned upon the instructions given to the jury, and upon the refusal to instruct as requested by the appellants. The theory of the defense was sufficiently covered by the instructions given, and we think appellants' rights were not prejudiced. We find no prejudicial error under other minor assignments, and having discussed at length the principal questions raised on the appeal, we believe it is unnecessary to discuss in detail the numerous assignments of error.

The judgment is affirmed.

MOUNT, C. J., FULLERTON, ROOT, CROW, DUNBAR, and RUDKIN, JJ., concur.