## SKELLY v. UNITED STATES.

### BERMAN v. SAME.

### Nos. 1131, 1132.

Circuit Court of Appeals, Tenth Circuit.

March 20, 1935.

J. B. Dudley, of Oklahoma City, Okl. (A. M. Cary, of Minneapolis, Minn., on the brief), for appellants.

Geo. E. Massey, Jr., Asst. U. S. Atty., of Oklahoma City, Okl. (Wm. C. Lewis, of Oklahoma City, Okl., on the brief), for the United States.

Before LEWIS and PHILLIPS, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

Albert L. Bates, George R. Kelly, Kathryn Thorne Kelly, Harvey J. Bailey, Robert G. Shannon, Armon Crawford Shannon, Ora L. Shannon, Charles Wolk, Sam Kronick, Edward Berman, Peter Valder, Sam Kozberg, Clifford Skelly, and Isadore Blumenféld were charged by indictment under the act of June 22, 1932, 47 Stat. 326 (see 12 USCA §§ 408a to 408c), with conspiracy to commit the substantive offense defined therein.[1]

---

[1] The Act of June 22, 1932, read as follows:

"That whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward shall, upon conviction, be punished by imprisonment in the penitentiary for such term of years as the court, in its discretion, shall determine: Provided, That the term "interstate

The indictment charged that the defendants "did knowingly, wilfully, unlawfully, and feloniously combine, confederate and agree together" continuously from July 22, 1933, to August 23, 1933, to commit an "offense against the United States * * * that is to say violate * * * the Act of Congress approved June 22, 1932, which provides a penalty for transportation in interstate commerce of any kidnapped person held for ransom or reward."

That it was a part of such conspiracy that the defendants on or about July 22, 1933, at Oklahoma City would seize, kidnap, and abduct Charles F. Urschel, would transport him in interstate commerce from Oklahoma City, Oklahoma, to the Shannon Ranch in Wise County, Texas, would hold him for a ransom of $200,000, and would demand payment thereof in used twenty-dollar Federal Reserve notes.

*"That it was a further part of said conspiracy that they, the defendants aforesaid, immediately upon receipt of said ransom money would proceed to Denver, Colorado, St. Paul, Minnesota and divers other points unknown to the Grand Jurors far distant from the scene of kidnapping, place of confinement and place of ransom payment for the purpose of changing said ransom money for other moneys or securities in order to avoid detection, apprehension and arrest through the means of marked money; * * **

" * * * that at the hereinafter stated times, * * * for the purpose of carrying out and to effect the object * * * of said conspiracy, the hereinafter named defendants did, at the several times and places hereinafter mentioned in connection with their names, the several overt acts hereinafter specified * * *.

"13. That on or about August 5, 1933, at Minneapolis, Minnesota, Edward Berman, alias Barney Berman, Charles Wolk, Peter Valder, alias Hackett, alias Nelson, Sam Kozberg, Isadore Blumenfeld and Clifford Skelly and Sam Kronick did knowingly, wilfully and unlawfully possess, conceal and exchange approximately Five Thousand Five Hundred Dollars ($5,500.00) of the original ransom money paid to the said conspirators for the release of the said Chas. F. Urschel." (Italics ours.)

The Kellys were tried separately from the other defendants and convicted. The remaining defendants were tried jointly and all convicted except Wolk, Kronick, Valder, Kozberg, and Blumenfeld.

Kelly and Bates kidnapped Urschel on July 22, 1933, at Oklahoma City, transported him to the Shannon ranch in Wise County, Texas, and there held him for ransom from July 23 to July 31, 1933. On the latter date they transported Urschel from the Shannon ranch to a point near Norman, Oklahoma, where they released him.

Kelly and Bates demanded payment of a ransom of $200,000 in used twenty-dollar Federal Reserve notes. The ransom was paid to Kelly in the form demanded at Kansas City, Missouri, on July 30, 1933.

The following telegram, the original of which was in the handwriting of Bates, was sent from Minneapolis on August 8, 1933:

"Western Union Telegram
            August 8, 1933, 1:39 P. M.
"R. G. Shannon,
"c/o Sales Manager, Cadillac Factory Sales Branch
"Cleveland, Ohio.
"Deal has fell through. Jack and Tom have left. Communicate with me at Box 631.
                                            "George
"Geo. H. Miller, Sheridan Hotel, Minneapolis."

The Kellys were at the Cadillac Motor Car Company at Cleveland, Ohio, on June 2 and 3, 1933, and purchased a 16-cylinder Cadillac. They returned August 8, 1933, and paid the Motor Company $1310, the balance due on such automobile, and arranged to purchase a second automobile.

In dealing with the Motor Company they went under the name of R. G. and Ora L. Shannon. The above quoted telegram was delivered to them on August 8 by the Motor Company. After having arranged for the purchase of a second car, they informed the Motor Company on August 9, 1933, that

---

or foreign commerce' shall include transportation from one State, Territory, or the District of Columbia to another State, Territory, or the District of Columbia, or to a foreign country; or from a foreign country to any State, Territory, or the District of Columbia: Provided further, That if two or more persons enter into an agreement, confederation, or conspiracy to violate the provisions of the foregoing Act and do any overt act toward carrying out such unlawful agreement, confederation, or conspiracy such person or persons shall be punished in like manner as hereinbefore provided by this Act."

they had to return to Paradise, Texas, on account of the illness of Mrs. Kelly's mother, and had decided not to purchase the second car.

█ Coulter, a special agent, learned on August 5, 1933, that certain of the ransom bills had been received by the Hennepin State Bank of Minneapolis. He traced them back to Berman and Skelly. Berman, Skelly, and Blumenfeld were in the illicit liquor business. Berman told Coulter that a man came to their office in the West Hotel on August 3, 1933, introduced himself as Collins and said he was from the south and wanted to buy some liquor; that he did not know the man so he turned him over to Blumenfeld; that Blumenfeld talked to the man and then informed him, "this man knows some people down South. I can say he is all right." That they then made a deal for 125 cases at $5,500. That the man counted out $5,000 in $20 bills and the balance in $100 and $10 bills. That about an hour and a half later the man returned in a Chevrolet truck and took the liquor; that they did not know who the man was and had not seen him since; that they gave Max Bender of St. Paul $1440; that Skelly used some of the money to repair his house; that he let his son-in-law have $1100, and they used $1000 to purchase a cashier's check, payable to S. H. Peters, from the Hennepin State Bank; that he and Skelly went to the bank with Sam Frederick, and that Frederick purchased the draft; that Chas. Wolk sent Frederick to the bank with them. .

Skelly made a like statement to Coulter as to the disposition of the money. Skelly also stated that he went with Frederick to the bank.

On August 5, 1933, Berman requested Wolk by telephone to go to the bank and purchase a cashier's check. Berman and Skelly then went to Wolk's place of business. Wolk instructed Frederick to go to the bank with Berman and Skelly, who were sitting in a car outside the warehouse of the Wolk Transfer Company. Frederick was a truck driver for that company. Frederick accompanied the two men to the Hennepin State Bank in Minneapolis. When they got to the bank the man who was driving said, "Go and get a check for $1800 under the name of S. H. Peters." Skelly afterwards admitted to Frederick that he was the driver. The man in the rear seat gave Frederick two bundles of bills and a 25-cent piece. Frederick went to Mr. Hagan's cage in the bank and said, "Mr. Hagan, please give me a cashier's check." Frederick obtained the check and went out onto the sidewalk, but did not see Berman and Skelly. He stood there a moment and then heard the sound of an automobile horn, turned around, and saw Skelly and Berman in the car. He handed Berman the check through the car window, and Skelly and Berman drove away.

Hagan had received a notice concerning $20 notes of the Tenth Federal Reserve District. He observed a large number of such notes among the currency with which Frederick had purchased the cashier's check, and notified an officer of the bank, who called in Coulter. The latter came and took the numbers of the notes. Fifty of them were ransom notes.

Previously to August 5, Valder had cashed a check on a Fargo, North Dakota, firm for $1,000 at the First National Bank & Trust Company of Minneapolis. It was returned on account of insufficient funds.

The First National Bank notified Valder to take up the check, and on August 5, 1933, he presented the cashier's check made to Peters to take up the $1,000 check, and received $800 in currency. Valder was in the liquor business.

Coulter arrested Frederick and Wolk on August 6, and Valder on August 7. Statements respecting such arrests first appeared in the newspapers on August 8.

After getting a statement from Wolk, Coulter started to look for Berman on August 8. He went to Berman's office in the West Hotel, but no one was there. He kept searching for Berman but failed to locate him. On August 13 Berman came to Coulter's office. On August 25 Coulter interrogated Berman and Skelly. Coulter asked Berman why he ran away when Valder was arrested. Berman replied, "I was afraid they were going to take me back down south without a chance to confer with my lawyer." Coulter said, "How do you know you would be taken down there?" Berman answered, "I heard it; you know how news travels." Berman admitted that he, Skelly, Banks, Blumenfeld, and Cary their lawyer, were at Medicine Lake Cottage on August 8. Berman, Skelly, and Blumenfeld all said they were there because they wanted to confer with their attorney. Skelly said he was scared, and Blumenfeld said he knew he would be picked up if he remained in Minneapolis.

Twenty-five of the ransom notes were deposited in the St. Anthony Falls office of

the First National Bank & Trust Company of Minneapolis on Saturday, August 5, 1933, by Kronick. Kronick was in the barber supply business, and stated to Coulter he got the money in the regular course of business during the week it was deposited. Sam Kozberg, a cousin of Kronick's, let the latter have $500 in $20 bills on August 5, 1933. Kozberg obtained them from Berman on that date. Kozberg testified Kronick was indebted to his (Kozberg's) company, the LaSalle Products Company, in excess of $500; that Berman owed Kozberg and Kozberg went to Berman and secured the $500 and gave it to Kronick, who in turn gave Kozberg a check for $500 payable to the Products Company, and that he did not take a promissory note from Kronick.

Neither Berman nor Skelly testified in his own behalf.

Was the evidence sufficient to warrant the jury in finding that Berman and Skelly had knowledge of the conspiracy and its unlawful purpose, when they received certain of the ransom notes and exchanged them.

It is quite plain that they received the notes from Bates, and that Bates learned through the press on August 8 of the arrest of Wolk, Frederick, and Valder; hence the wire to Kelly on that date. Berman's and Skelly's explanation of how they received the notes from an entire stranger is incredible. Their conduct in going about the purchase of the cashier's check was most unusual. Why did they not go directly to the bank themselves? When Valder was arrested, they concealed themselves and went into consultation with their attorney. Kozberg received $500 in ransom notes from Berman. Kronick's and Kozberg's conduct strongly indicated their guilty knowledge when they received the notes. When Kronick was arrested, he falsified about where he had obtained them. The Products Company would have taken the currency from Kronick. Why all the circuity? Kozberg did not take a promissory note from Kronick. If Kronick knew the money was "hot," it is likely that Skelly and Berman also knew.

We conclude that the circumstances were such as to warrant the jury in finding that Berman and Skelly, with knowledge of the conspiracy and its unlawful purpose, agreed with Bates to join the conspiracy and to aid the principals to the substantive offense to avoid detection, apprehension, trial, and punishment by exchanging ransom notes for unidentifiable currency.

Was the conspiracy completed and at an end when Urschel was released on July 31, or did it continue until the ransom notes were exchanged for other monies to aid the conspirators who committed the substantive offense to avoid detection, apprehension, trial, and punishment.

It must be kept in mind that the indictment is not under the general conspiracy statute, but under the conspiracy provision of the act of June 22, 1932, which is limited to a conspiracy to commit the substantive offense defined therein.

"An *accessory* is he who is not the chief actor in the offense, nor present at its performance, but is some way concerned therein, either *before* or *after* the fact committed." Jones' Blackstone, Books 3 and 4, p. 2202; United States v. Hartwell, 26 Fed. Cas. 196, No. 15,318; Able v. Commonwealth, 5 Bush (Ky.) 698; Connaughty v. State, 1 Wis. 159, 60 Am. Dec. 370. "An accessory is one who participates in a felony too remotely to be deemed a principal." Bishop on Criminal Law (9th Ed.) vol. 1, § 663.

An accessory after the fact is one who, knowing a felony to have been committed by another, receives, relieves, comforts, or assists the felon in order to hinder the felon's apprehension, trial, or punishment.[2]

Berman and Skelly, with knowledge that the substantive offense had been committed, agreed with Bates, one of the principals to the substantive offense and an original member of the conspiracy, to commit certain criminal acts and thereby assist such principals to avoid detection, apprehension, trial, and punishment.

Upon the commission of such acts by Berman and Skelly they would become accessories after the fact to the principals to such substantive offense, and upon conviction thereof liable to punishment as provided in 18 USCA § 551.

The acts of a principal to a substantive offense and the acts of an accessory after the fact thereto, are one continuous criminal transaction. At common law the principal and accessory after the fact may be jointly indicted and where so indicted they

2 Jones' Blackstone, Books 3 and 4, p. 2204; United States v. Hartwell, 26 Fed. Cas. 196, 199, No. 15,318; Albritton v. State, 32 Fla. 358, 13 So. 955; State v. Davis, 14 R. I. 281, 283; Schleeter v. Commonwealth, 218 Ky. 72, 290 S. W. 1075.

should be charged in one count with but one commencement and one conclusion.[3] There-fore the acts of the two constitute a single offense committed by them jointly, one act-ing as principal and the other as accessory after the fact.

In Bishop on Criminal Law (9th Ed.) vol. 1, § 692 (3), it is stated:

"In reason * * * one who renders this assistance, thus adding his will to an evil thing after another has done it, does not thereby become a partaker in the guilt be-cause only when an act and evil intent con-cur in time, is a crime committed. There-fore it is not from the reasoning of the law, but from ancient practice confirmed by mod-ern, that the helper of a felon after the fact is classed as an accessory. This technical rule has become too fundamental in the common law of crime to be overcome by judicial reasoning."

It follows that Berman and Skelly know-ingly agreed to join as accessories after the fact in the commission of the substantive offense defined in such act.

█ Clearly the whole of such a criminal transaction may be embraced within a sin-gle conspiracy. It was here. The conspir-acy, as originally formed and here charged, embraced two integral objects or purposes, one the commission of the substantive of-fense by the original conspirators as princi-pals to obtain the ransom money, and the other the commission of the acts by Berman and Skelly as accessories after the fact to enable such principals to avoid detection, ap-prehension, trial, and punishment.[4]

█ We are of the opinion that the criminal agreement, both that part which had for its purpose the commission of the substantive offense by principals and that part which had for its purpose the commission of ac-

---

[3] People v. Jordan, 244 Ill. 386, 91 N. E. 482, 484; Bishop's New Criminal Pro. (2d Ed.) vol. 2, § 467.

In People v. Jordan, supra, the court said:

"At common law accessories 'must be convicted of a felony of the same species as the principal.' 1 Chitty on Crim. Law (4th Am. Ed.) *272; 4 Blackstone's Com. *39. The tendency of modern stat-utes, however, is to consider the offense of an accessory after the fact as a minor and separate offense, and to provide a lighter punishment than for the princi-pal offense. 1 Russell on Crimes (9th Ed.) 66; 1 Ency. of L. & P. p. 278, and cases cited. Our own statute has provid-ed a penalty for an accessory after the fact different from that for the principal. Hurd's Rev. St. 1908, p. 772, c. 38, par. 276. But these statutory changes as to punishment have not in any manner af-fected the rule that the principal and accessory after the fact can be joined in the same indictment and tried together.

"The authorities also unite in holding that if a principal and accessory are joined in the same indictment they should be joined in the same count. Bishop on Criminal Procedure (volume 2, 3d Ed.), in considering this question, says (page 5): Where 'the accessory, whether before or after the fact, is indicted with the prin-cipal, the whole allegation constitutes only one count, with one conclusion—not two.' Again, the same author says (3d Ed. vol. 1, § 467): 'Though the guilt of the ac-cessory is stated after that of the princi-pal, on which it is dependent, the whole allegation constitutes but one count, hav-ing properly one commencement only, and one conclusion.' In Bulloch v. State, 10 Ga. 47, 62, 54 Am. Dec. 369, where there

was such an indictment, the court said: 'But it is said the several counts in this in-dictment do not so conclude as against the defendant, Bulloch, and to maintain that position it is assumed that there are 24 counts in this indictment instead of 12. How is the fact? Is the accusation against Bulloch, as the principal offender, con-tained in a separate count against him, independent of James Quantock and George Thrift as accessories, or are they all accused in each count; the one as hav-ing actually committed the offense, the others as being accessories after the fact? Each count in the indictment charges and accuses George J. Bulloch with the of-fense of larceny * * * and James Quantock and George Thrift as being ac-cessories thereto after the fact, and after stating the offense against both * * * concludes, * * * "contrary to the laws of said state, the good order, peace, and dignity thereof." This indictment is believed to have been framed by the plead-er in strict conformity with the English precedents.' All forms of indictments and discussions in the standard authorities, as well as the decisions, agree that when the principal and accessory (whether be-fore or after the fact) are joined in the same indictment they should be joined in the same count. 1 Archbold on Crim. Pr. & Pl. (Waterman's Ed.) p. 81; 1 Hale's Pleas of the Crown (Stokes & Ingersoll's Ed.) p. 625, note 5; 2 Chitty on Crim. Law (4th Am. Ed.) p. *5; Burns' Jus-tice of the Peace and Parish Officers (29th Ed.) p. 26; Wharton's Precedents of In-dictments (1871 Ed.) 53; 1 Ency. of Laws of Eng. p. 86."

[4] See italicized portion of indictment, supra.

cessory criminal acts by accessories after the fact, constituted one entire conspiracy and is embraced within the conspiracy provision of the act and that such conspiracy was not completed until both its objects were effected. Like conclusions have been reached in analogous cases.[5]

We conclude that when Berman and Skelly, with knowledge of the conspiracy and its unlawful purpose, agreed to join it and commit such acts as accessories after the fact, they thereby became parties to the conspiracy with the same effect as if they had joined in at its inception.

[5] In Lew Moy et al. v. United States (C. C. A. 8) 237 F. 50, 52, the defendants were convicted on an indictment which charged a conspiracy to import Chinese into the United States contrary to 8 US CA § 269. In that case the court said:

"It is also urged that the conspiracy was at an end the instant the Chinese whose illegal entry was procured and facilitated were brought across the international boundary, and therefore the trial court erred in admitting in evidence the subsequent acts and declarations of one conspirator against the others. This is too narrow a view of the crime charged. Successfully to consummate the unlawful introduction of the prohibited aliens required more than the mere bringing of them across the line. It was necessary to evade the immigration officials by transporting them into the interior and concealing their identity. The subsequent assistance by defendants to that end may well have been an essential part of the unlawful project. It is not necessary that each conspirator participate in each step or stage of the common general design. One of them may do one thing; another, another. Some may take major parts, while the participation of others may be in a minor degree."

In State v. Pratt, 121 Mo. 566, 26 S. W. 556, 557, the court said:

"The deed in this case, forged in the name of Bishop by Cottrell and his associates, was executed on the 9th day of June, 1893. It is claimed, upon this ground, that any subsequent transactions regarding the land trade, letters to and from Lesueur, etc., were inadmissible against defendant, because he was not shown to have been a participant in such subsequent transactions. No rule of law is better settled than that a conspiracy being shown, and that conspiracy ended, no word of any one of the conspirators can be received as incriminating evidence against any one or more of the others. This rule, however, only applies where the words are merely narrative of a past transaction. It does not apply where the transaction—the criminal design—is still pending and unaccomplished. Sometimes it is a nice and difficult question to determine when any criminal design has terminated. In this case, however, no difficulty arises, because the aim and object of the conspirators, evidently, was to so

use the land as to which they had acquired a fictitious title as to divide the proceeds of their ill-gotten gains among themselves, and until this was done the design was still inchoate and pending; and, as shown by the evidence, the conspirators were willing to forge another deed, if necessary, to make their unlawful gains secure. As illustrating this point, it has been ruled that if two conspired to steal a watch, and then to divide its proceeds between them, what one said and did between the stealing and the dividing was good evidence against both. Scott v. State, 30 Ala. 503. See, also, 2 Bish. Cr. Proc. § 230, and cases cited. And often, in such circumstances, when the subsequent statement or declaration of a co-conspirator is thus a part of the res gestæ,—explanatory and illustrative of it,—it is not inadmissible, though it may refer to a past event as the true reason of the present conduct. Stewart v. Hanson, 35 Me. [506] 509; Clinton v. Estes, 20 Ark. 216. On this ground, we hold that the evidence in question was clearly admissible."

In Commonwealth v. Smith, 151 Mass. 491, 24 N. E. 677, 678, the court said:

"The evidence of the conversation of Arthur B. Kendall after the fire, although not in the presence of the Smiths, was admissible. There was evidence tending to show a conspiracy between the Kendalls and the Smiths to burn the house for the purpose of obtaining insurance upon property claimed to be therein. The conversation related to the course to be pursued by Arthur in consequence of certain evidence developed at the fire inquest, and in this Arthur expressed a wish to remove the goods from Griffin's, where they had been previously stored by C. R. Kendall and the defendant George T. Smith, and was informed by C. R. Kendall of Morill's place. * * * The evidence of Arthur B. Kendall's conversation could not be given in evidence without necessarily including that of his brother, and was connected with acts done immediately thereafter by himself and the defendant Smith in reference to the disposition of the trunks, etc. Even if those declarations or conversations were subsequent to the burning, they were still made during the pendency of the criminal enterprise. They were not recitals of past occurrences, but were connected with acts

The telegram was admissible as a circumstance to show that Bates was in Minneapolis on August 8. The evidence shows Berman and Skelly were then members of the conspiracy, and its purpose had not then been fully accomplished.

But, were it otherwise, the court's instruction, which is as follows, properly limited the telegram.

"A conspiracy cannot be shown by the declarations or admissions of one party only, although they are admissible as to him. It can only be shown by the independent facts and circumstances evidencing the agreement or the common design. When a conspiracy is once shown each of the parties thereto is thereafter chargeable with what the others do and say in furtherance of it while it is pending and not at an end."

The judgments are affirmed.

done, evidently, to shield the conspirators from the consequences of their crime."

In State v. Dilley, 44 Wash. 207, 87 P. 133, 137, the court said:

"In cases where the conspiracy comprehends not only the actual offense committed, but from the beginning extends to and includes a common design or scheme to fabricate a defense, it is held that the conspiracy continues to exist even after the principal act is done, and that the declarations of one co-conspirator made under such circumstances and in furtherance of such design are admissible as against all, though made subsequent to the principal act. In Miller v. Dayton [57 Iowa, 423], 10 N. W. 814, the court said:

"'It is claimed that, if any conspiracy was entered into, it terminated with the killing of Miller, and that the evidence of any act or declaration of Jefferson Dayton, subsequently to that time, is inadmissible. If, as claimed, however, the conspiracy also had for its purpose to prevent suspicion from attaching to the defendant, and to enable him to escape justice, the objects of the conspiracy were not fully completed when Miller was killed. * * * Whatever the defendant himself may have done, in the fabrication of evidence, to prevent suspicion from attaching to him, or to avoid a prosecution, was proper to be shown to the jury, and considered by them. * * * And, if another person conspired with him to assist in the accomplishment of this purpose, his acts and declarations, in furtherance of the common design, are, we think, admissible.' See, also, People v. Mol [137 Mich. 692], 100 N. W. 913, 68 L. R. A. 871 [4 Ann. Cas. 960]; Scott v. State, 30 Ala. 503."

See also Murray v. United States (C. C. A. 7) 10 F.(2d) 409; United States v. McGuire (C. C. A. 2) 64 F.(2d) 485; People v. Storrs, 207 N. Y. 147, 100 N. E. 730, 45 L. R. A. (N. S.) 860, Ann. Cas. 1914C, 196; Miller v. Dayton, 57 Iowa, 423, 10 N. W. 814.