**UNITED STATES of America,**
**Appellee,**

v.

**Cabell Henning CARRIER, Jr., Appellant.**

**No. 9551.**

United States Court of Appeals
Fourth Circuit.

Argued Feb. 1, 1965.

Decided March 29, 1965.

Thomas P. Mains, Jr., Alexandria, Va. (Court-assigned counsel) for appellant.

Plato Cacheris, First Asst. U. S. Atty. (C. V. Spratley, Jr., U. S. Atty., on the brief), for appellee.

Before HAYNSWORTH, Chief Judge, SOBELOFF, Circuit Judge, and CHRISTIE, District Judge.

CHRISTIE, District Judge:

This case is here on appeal from a final judgment of the United States District Court for the Eastern District of Virginia, at Alexandria, Virginia, rendered July 6, 1964, sentencing Cabell Henning Carrier, Jr. to one year imprisonment, upon a verdict of a jury finding him guilty of the first count of a two-count indictment, to-wit:

"That on or about February 1, 1964, in Arlington, Virginia, in the Eastern District of Virginia and within the jurisdiction of this court, Cabell Henning Carrier, Jr. knowing that an offense against the United States had been committed by Walter Frank Fritts, to-wit, a violation of Title 18, United States Code, Section 2113 (bank robbery), did knowingly and wilfully receive, relieve, comfort and assist the said Walter Frank Fritts in order to hinder and prevent his apprehension for trial and punishment. (Violation of Title 18, United States Code, Section 3)."

The second count, charging Carrier with wilfully and knowingly harboring and concealing Fritts to prevent his discovery and arrest, was dismissed by the trial court at the close of the government's case on motion of the defendant.

The appellant on this appeal raises but two questions:

(1) Did the trial court err in refusing defendant's motion for a directed verdict of acquittal, and in allowing the case to go to the jury in the absence of evidence to sustain a finding of one of the necessary elements of the crime charged, to-wit, that the defendant intended to hinder and prevent the apprehension and punishment of Walter Frank Fritts? And

(2) Did the trial court err in failing to instruct the jury that they must find proof beyond a reasonable doubt in regard to the aforesaid intent on defendant's part, and without such proof should acquit, and instead instructing that the burden was on the defendant to prove a defense of coercion or duress?

The first point goes to the sufficiency of the evidence on the question of "intent," and the second point challenges the correctness of the court's instructions as to "burden of proof." These questions will be taken up and disposed of in their natural sequence.

The historical facts of the case are that, on January 30, 1964, an agent of the Federal Bureau of Investigation filed a complaint and obtained an arrest warrant for one Walter F. Fritts for the robbery of the Maryland National Bank of Baltimore, a federally insured institution, the previous day. Fritts, who had escaped from the Baltimore area, was later apprehended in Ozark, Arkansas, on February 15, 1964, with several identification cards on his person bearing Carrier's name.

Carrier, thirty-five years of age and a resident of Washington, D. C., had, prior to January 30, 1964, been in the company of Fritts in Arlington, Virginia, on two or three occasions over a period of one or two months. On January 31, 1964, Carrier's attention was called to a news-paper article relative to a bank robbery in Maryland which stated that Fritts was being sought in connection therewith. On February 1, 1964, Fritts, who was then in hiding in an apartment house at 6533 Third Street, N. W., Washington, had one Lawrence D. Ferrell seek out and contact Carrier. Ferrell found Carrier in a Washington bar at 25th and Pennsylvania Avenue and told him that Fritts wanted to see him. Though then knowing that Fritts was wanted for the bank robbery, Carrier, nevertheless, readily accompanied Ferrell to the apartment house obedient to Fritts' request.

There the latter told Carrier that he, Fritts, was wanted for the bank robbery and that he knew he was living on borrowed time; that he had shot one man and would shoot anyone who tried to stop him. This had reference to the police officer who was shot in the course of the robbery. Fritts then asked Carrier to drive him some thirty miles so that he could contact his cohorts in the robbery and get out of town. Though Carrier contends he demurred to thus assisting Fritts, the facts stand out, notwithstanding, that Carrier and Ferrell left Fritts at the apartment house and returned to the bar so that Carrier could get his jacket and his automobile. Carrier then drove Ferrell back to the apartment where Fritts entered the car and Ferrell departed. It is significant here to note that during the interval it appears that Carrier was under no restraint or threats from Ferrell and thus had ample opportunity in both distance and time to have extricated himself from the situation he found himself in by contacting the police by telephone from the bar or by driving to the nearest station in his car, instead of returning to the apartment to pick up Fritts. This is but one opportunity that was open to Carrier not to cooperate with Fritts in his efforts to avoid apprehension after he had full knowledge that Fritts was wanted by the police. There were others.

After Carrier picked up Fritts, he drove him to his own (Carrier's) apartment in Washington and after Carrier

had cleaned up there, they re-entered the car, stopping to get three fifths of whiskey and a case of beer, and again to get sandwiches at a grocery store. Carrier then drove Fritts around Arlington, Virginia, stopping at least twice to allow him to attempt to contact his accomplices by telephone. During this time they stopped at the house of one John Logan, an acquaintance of Fritts. While there, Fritts finally made contact and discovered that his accomplices were in Las Vegas. He then told Carrier to drive him to the National Airport so that he could catch a plane to Las Vegas before they gambled away all the stolen money. It is pertinent to note that upon reaching the Logan house, Fritts was admitted by the back door while Carrier, after waiting in his car outside, entered by the front door. It is obvious that Carrier, being the driver and in possession of the car, had he wanted to do so, could have at this time gotten beyond the reach of any danger from Fritts and notified the police of the latter's whereabouts.

On the way to the airport, they met one Pat Marlowe, a friend of Carrier's, who then accompanied them to the airport. Upon reaching the airport they parked across from the main entrance and Fritts told Carrier to buy a plane ticket to Las Vegas and instructed Pat Marlowe to remain in the car while Carrier did so. Carrier went across the street alone to the ticket office and purchased the ticket in his own name, and upon his return to the car, at Fritts' request, gave the latter some of his identification cards. Fritts then asked Mrs. Marlowe to disguise him with cosmetics, which she did as she stated, out of fear. Carrier then drove Fritts to the main terminal building where Fritts gave Carrier a total of $300.00 for "being a good boy" and there left the car to catch the plane. Here again, while he was alone in the airport (Fritts and Mrs. Marlowe having remained outside in the car across the street some distance from the main terminal), Carrier had a perfect opportunity to flee from Fritts or to alert the police as to Fritts' whereabouts without

any danger to himself, yet he failed to do so, but instead his actions demonstrate rather remarkably his eagerness to aid Fritts in his escape, knowing full well that Fritts had committed a felony and that a warrant was out for his arrest.

The following day Mrs. Marlowe discussed calling the authorities with Carrier, telling him that her lawyer had instructed her to do so, and she attempted to persuade Carrier to go with her to the police. Carrier declined, telling Mrs. Marlowe that Fritts would return his identification cards and no one would be aware of the incident. Later Mrs. Marlowe made a second appeal to Carrier to go to the police and he again attempted to dissuade her, stating that she too would be in trouble since she had put make-up on Fritts and aided his escape as he, Carrier, had done. Nevertheless, Mrs. Marlowe reported the matter to the authorities and Carrier was subsequently arrested and charged. He issued a written statement which, in all essential respects, is in accord with the foregoing narrative. The statement was read to the jury without objection. Also, when he took the stand in his own defense, Carrier admitted that he was aware that Fritts was wanted for bank robbery; he admitted Fritts told him the FBI was seeking to arrest him; he admitted taking Fritts to his apartment, thence to the Logan home and from there to the airport. He admitted purchasing the plane ticket for Fritts in his own name and giving Fritts his identification cards. He admitted getting $300.00 in cash from Fritts, and he admitted that from the time he was put in contact with Fritts by Ferrell to the time Fritts boarded the plane he had numerous opportunities to either escape or notify the authorities. And finally, he admitted trying to talk Mrs. Marlowe out of notifying the police.

The applicable statute (18 U.S.C. § 3) provides:

"Whoever, knowing that an offense against the United States has been committed, receives, relieves comforts or assists the offender in order

to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."

The jury found Carrier guilty under this statute of being an accessory after the fact.

■■ While counsel for Carrier does not contend on this appeal that Carrier did not commit the acts charged to him, he takes the position that there was no proof that such activity was designed to hinder the apprehension of Fritts. However, it is undisputed that a federal arrest warrant was issued for Fritts on January 30, 1964, and that Fritts was not apprehended until February 15, 1964, in Arkansas; that from January 31, 1964 to the time of apprehension Carrier knew of the crime, knew Fritts was wanted by the police for its commission, and that he had aided Fritts in his efforts to avoid detection and apprehension, even to the extent of letting him use his name for the plane ticket and his identification cards. His only excuse for his incriminating conduct in this regard was that he was afraid to do otherwise under the circumstances. His persistence, however, in trying to persuade Mrs. Marlowe not to reveal to the police the circumstances of Fritts' flight and the part he and she had in it, along with all other facts and circumstances in the case, were proper factors for the jury to consider on the question of intent. Skelly v. United States, 76 F.2d 483 (10th Cir. 1935); United States v. McCarthy, 196 F.2d 616 (7th Cir. 1952); and Silverman v. United States, 220 F.2d 36 (8th Cir. 1955). This factual issue having been submitted to the jury and they having resolved it against the defendant, the evidence on appeal must be viewed in the light most favorable to the government. United States v. Johnson, 324 F.2d 264 (4th Cir. 1963). So gauged, we find the verdict to have ample evidentiary support, and it cannot properly be disturbed, unless we find the jury were erroneously instructed as to the law of the case.

Passing now to the court's charge. Carrier's counsel argues that the court did not correctly instruct the jury as to burden of proof on the question of intent, a necessary element of the crime charged. After the case was submitted to the jury under a comprehensive charge, they asked for clarification of the words "knowingly and willfully," and the court proceeded to recharge them on the meaning of these words as follows:

"The word, 'knowingly,' as used in the crime charged here, means that the act was done voluntarily and purposely and not because of a mistake or an accident. Knowledge may be proved by a defendant's conduct and by all the facts and circumstances surrounding the case. No person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate.

"The word, 'willfully,' as used in the crime charged, means that the act was committed by a defendant voluntarily, with knowledge that it was prohibited by law and with the purpose of violating the law, and not by mistake or accident or in good faith."

In his original charge, in addition to defining to the jury the meaning of the words "knowingly and willfully" substantially as set out above, he went on to charge on the element of specific intent as follows:

"Now, this crime requires proof of a specific intent before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act.

"To establish specific intent, the government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case."

The charge continued by telling the jury that the defendant comes into court presumed to be innocent, and that this presumption of innocence is an abiding one and goes with the defendant through the entire case and applies in every stage thereof until repelled by proof; that the burden was upon the government to prove

by evidence beyond a reasonable doubt the guilt of the defendant and that to meet this burden the guilt of the defendant must be proved beyond a reasonable doubt as to *"all of the elements of the offense charged to him."* Another paragraph in the charge told the jury:

"To warrant the conviction of the defendant, the evidence of the guilt of the defendant must be so conclusive as to exclude every possible hypothesis of his innocence, and if the jury has a *reasonable doubt concerning the establishment of any essential element of the offense,* they must acquit the accused, and if the evidence is just as consistent with his innocence as with his guilt, the defendant cannot be convicted."

It is inconceivable, therefore, that the jury did not understand that the burden was on the government to prove the defendant guilty beyond a reasonable doubt and that this burden and degree of proof applied to each and every element of the charge as they had been defined by the court. Before the charge was given, the court gave both sides an opportunity to submit requests for a charge and both announced they had none. However, it is true that in argument on a motion for a directed verdict at the close of the government's case, counsel did make this request:

"Mr. Mains: I want you to tell the jury that it is necessary that they believe beyond a reasonable doubt that the reason that this defendant did what he did was in order to prevent the government from capturing Fritz, or words to that effect."

After the charge was given at the close of all the evidence, counsel for Carrier informed the court that he found the charge to be "satisfactory" and he took no exceptions to it. Thus, it is clear that he then considered that those portions of the charge dealing with specific intent and burden of proof were sufficient to meet what he had in mind when he made the above-quoted statement.

■ Viewing the original and supplemental charges as a whole, we find that they adequately and correctly instructed the jury on all the essential elements of knowledge and wilfulness and defined these terms to mean an act done voluntarily and with knowledge that it was prohibited by law and not an act done by mistake, accident or in good faith. Finn v. United States, 256 F.2d 304 (4th Cir. 1958). The charge sufficiently told the jury that the government must prove the defendant's specific intent to violate the law, in the manner charged, and that they could not convict him if they believed he acted in fear, since in that case he would not be acting voluntarily with knowledge nor with intent, as is clearly shown by the following additional excerpt from the charge:

"His defense is that he did not do it knowingly; he did not do it willfully; he did not do it intentionally. He tells you that he did it because he was in fear of his own life if he did not do it.

"Now, that is factual. That is a fact that you will have to find, based upon the instructions as to knowledge and willfulness and specific intent in the crime that I have just outlined to you.

"You reach the question, and if you find from the evidence, or unless you are satisfied beyond a reasonable doubt that he did it willfully and knowingly, then you should find him not guilty because if he was forced to do it by a gun or by an honest fear, an honest fear of his life or even an honest fear of bodily harm, he could not have done it knowingly, willfully and intentionally."

■ Moreover, whatever frailties a more critical examination of the charge might reveal, they cannot be said to be of such serious import as to come within the exception which allows an appellate court to notice plain errors or defects affecting substantial rights even though they were not properly brought to the trial court's attention. Lyons v. United States, 325 F.2d 370 (9th Cir. 1963) cert.

den. 377 U.S. 969, 84 S.Ct. 1650, 12 L.Ed. 2d 738. Instead, they will be considered as having been waived by the defendant's failure to object or except to the charge. Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A.; United States v. Borda, 285 F.2d 405 (4th Cir. 1961) cert. den. 365 U.S. 844, 81 S.Ct. 804, 5 L. Ed.2d 810; United States v. Whiting, 311 F.2d 191 (4th Cir. 1963).

Being thus convinced from a most painstaking examination of the record that the defendant has had a fair and impartial trial, according to· recognized standards of judicial procedure, and that there is substantial support in the evidence for the verdict returned, the judgment below must necessarily be, and it is hereby

Affirmed.