**LASKA v. UNITED STATES.**\*
No. 1317.

Circuit Court of Appeals, Tenth Circuit.
March 27, 1936.

Rehearing Denied April 13, 1936.

*Writ of certiorari denied 56 S. Ct. 957, 80 L. Ed. ——.

Ralph L. Carr, of Denver, Colo. (Jean S. Breitenstein and John G. Reid, both of Denver, Colo., and David Tant, of Oklahoma City, Okl., on the brief), for appellant.

F. M. Dudley, Asst. U. S. Atty., of Oklahoma City, Okl. (William C. Lewis, U. S. Atty., and George E. Massey, Jr., Asst. U. S. Atty., both of Oklahoma City, Okl., on the brief), for the United States.

Before McDERMOTT and BRATTON, Circuit Judges, and KENNEDY, District Judge.

McDERMOTT, Circuit Judge.

Ben B. Laska, an active practitioner at the bar, was convicted of conspiracy to violate the statute prohibiting the transportation in interstate commerce of a kidnaped person. 18 U.S.C.A. § 408c. The details of the atrocious crime perpetrated on Charles Urschel may be found in four opinions of this court on the appeals of other members of the conspiracy.[1] Suffice it here to say that on the night of July 22, 1933, Kelly and Bates, armed with a machine gun and a revolver, interrupted a bridge game at the Urschel home, abducted him and carried him to the Shannon farm in Texas; there they held him, chained and blindfolded, until July 31. On July 30 Kelly collected $200,000 ransom in twenty-dollar bills, the numbers on which were kept. The charge against Laska is that he entered the conspiracy after August 15, and that the part he played was to aid Mrs. Bates and her son Edward Feldman to change the marked money into good money and in accepting ransom money, knowing it to be such, in exchange for his legal services.

*The Offense Charged.* An understanding of the indictment may dispel some confusion which appears in the briefs. It alleges that from July 22, 1933, until the return of the indictment on December 14, 1934, 14 persons, including Laska, conspired to violate the Lindbergh Law. Bates and Kelly and the Shannons, heretofore

---

[1] Bailey v. United States (C.C.A.10) 74 F.(2d) 451;

Skelly v. United States (C.C.A.10) 76 F.(2d) 483, certiorari denied 295 U.S. 757, 55 S.Ct. 914, 79 L.Ed. 1699;

Shannon v. United States (C.C.A.10) 76 F.(2d) 490;

Kelly v. United States (C.C.A. 10) 76 F.(2d) 847.

convicted, were named; their part in the conspiracy—the abduction of Urschel, holding him for and collecting the ransom—was alleged. As an integral part of the original conspiracy it was alleged that the conspirators, including Laska, would proceed to sundry distant places "for the purpose of changing said ransom money for other moneys or securities in order to avoid detection, apprehension and arrest, through the means of marked money."

Twenty-nine overt acts were alleged, 15 of which dealt with the abduction, holding, collection and concealment of the ransom before Laska entered the scene. Eight overt acts of burying or otherwise concealing the ransom by other members were alleged to have occurred during the 15 months after Laska is alleged to have joined the conspiracy. Five overt acts are alleged as to Laska, to wit, the paying to him on two occasions of $8,000 and $2,000, and his receipt, possession, and concealment thereof knowing it was ransom money, and his payment of $1,000 thereof to James C. Mathers, his associate counsel in Oklahoma. One overt act dealt with Mathers, who was acquitted.

The evidence conclusively proved a conspiracy to kidnap Urschel and hold him for ransom, to conceal the ransom money and to exchange it for good money or other things of value. The evidence conclusively proved many overt acts in pursuance of the conspiracy, including eight after Laska was alleged to have entered the conspiracy. It is not disputed that a criminal conspiracy was formed and had been partially accomplished when the indictment was returned.

■■■ There can be, then, but one issue: Did Laska, knowing of the conspiracy, enter it? It is not necessary that he know all the members or the part each played or was to play. Marcante v. United States (C.C.A.10) 49 F.(2d) 156. The gist of the offense is the conspiracy; while an overt act by some member must be alleged and proven before the conspiracy becomes a criminal offense, it need not appear that each conspirator performed an overt act, or that the overt act be criminal. United States v. Rabinowich, 238 U.S. 78, 86, 35 S.Ct. 682, 59 L.Ed. 1211. In Bannon v. United States, 156 U.S. 464, 468, 469, 15 S.Ct. 467, 469, 39 L.Ed. 494, the Supreme Court said:

"The gist of the offense is still the unlawful combination, which must be proven against all the members of the conspiracy, each one of whom is then held responsible for the acts of all. * * * To require an overt act to be proven against every member of the conspiracy, or a distinct act connecting him with the combination to be alleged, would not only be an innovation upon established principles, but would render most prosecutions for the offense nugatory. It is never necessary to set forth matters of evidence in an indictment."

And in Chew v. United States (C.C.A.8) 9 F.(2d) 348, 353, Judge Booth said:

"If the defendants were all in the continuing conspiracy, it is immaterial by which one of them the overt acts were committed. The overt act of one is the act of all."

■ No bill of particulars was asked for. No surprise is claimed. If the evidence established that Laska was a member of the conspiracy charged and proven, it is no defense that each act of his in furtherance of the conspiracy was not set out in the indictment.

*The Trial.* There was no conflict at the trial over the facts concerning the abduction of Urschel and the collection of the ransom. Likewise it is undisputed that Bates came to Denver on August 10 with $90,000 of the ransom money in a locked brown grip or bag. He went to an apartment where his wife and stepson, Edward Feldman, lived. On August 12 he was arrested but specific charges were not immediately filed. He had on his person $660 of the ransom money. He sent a note from the jail to his wife telling her there was money in the brown grip and for her to flee. She and her son immediately left taking with them the ransom money. He retained Laska as his counsel on August 13th or 14th. Bates was then suspected of bank robbery and other offenses, but not of the Urschel kidnaping. Bates told Laska how to get in touch with his wife or stepson who would provide him with money for his fee and expenses. Laska did contact young Feldman. His first conference with Feldman occurred on August 16th or 17th. Laska had learned from the police officers and the newspapers on the afternoon of August 15 that Bates was charged with the Urschel kidnaping and that ransom money had been found on his person. Laska defended Bates upon his trial in September. It is likewise undisputed that Mrs. Bates and Feldman

buried the ransom money in various places at intervals during the year ensuing.

What occurred between Laska and Feldman and Mrs. Bates at various conferences is in sharp dispute.

Feldman testified that on his first meeting with Laska, Laska said he knew about the money which Bates left in the apartment, and asked who had it; Feldman said it was at Cheyenne; Laska asked if it was buried and when told it was not, said, "Lord, kid, you should have buried the money. * * * Good Lord, why didn't your mother bury that money? Don't you read the papers? Here is a paper right here." Laska showed him a paper dated August 15, carrying a picture of Bates, an eight-column headline charging him with the Urschel kidnaping, and a two-column head that ransom money had been found on his person. Laska told him the money was "plenty hot" and gave him explicit instructions as to how to bury it. Laska told them to change their names and suggested that he use the name Axel C. Johnson and his mother Ruth Johnson. Laska asked for and was given Feldman's driver's licenses and identification card so that his use of an assumed name would not be detected in case of arrest; Laska told him to get rid of his dog to escape detection. Laska asked for a fee of $10,000, and inquired whether Mrs. Bates had any "good money"; when told she had not, Laska said the case was worth $50,000, and he needed $10,000 right away. Feldman went back to Cheyenne, got $10,000 (or as Laska later claimed, $8,000) of the ransom money, came back to Denver, went to Laska's home at night, gave the name of Axel C. Johnson and was admitted. Laska took him to his bedroom and there received the money in twenty-dollar bills which came from the Bates grip. Feldman then testified as to Laska's instructions as to how to change the ransom bills into unmarked money, as follows:

"He said he advised mother and I to leave Cheyenne because it was getting pretty hot around, and to leave for some big city in the East. He suggested Chicago would be our best bet, and to disguise ourselves, dress as an ordinary class of people, and to take the day coach, ride a day coach instead of a Pullman on the train, and he says, 'When you get to Chicago you can change this hot money. You can change it at department stores, drug stores or clothing stores. Go to the busy vicinity of the town and change it; not to have more than one or two bills on you at a time.' He says, 'After you get some of this changed, to put some of this ransom money in a safety deposit box, rent a safety deposit box and put it in.' He says, 'No one would look in there.'"

Feldman and his mother, following Laska's instructions, changed their names and went to Chicago. Feldman returned to Denver about the last of August, when Laska told him he needed $2,000 in "changed hot money"; to get the hot money changed and bring it to Oklahoma City by September 10th or 11th; that he had to pay a local attorney there. Feldman said his mother wanted to give herself up, but Laska vigorously protested. Feldman went to Oklahoma City on September 16th and met Laska in a hotel room. He told Laska he had $2,000, but it was hot money. Laska told him to go in the bathroom and put it under the rug, which he did.

On November 16th or 17th Feldman and his mother came to Denver and saw Laska at his home at night. Mrs. Bates again wanted to give herself up, but Laska objected. Laska took title to her Buick car and then, "Laska had advised us to keep away from the west, the northwest, and he says to mother to forget about them children of yours. He says, 'Look,' Laska pointed to me, 'Do you mean to tell me he can't take care of himself?' He says, 'Forget about your children; make new friends; make new acquaintances, but associate with no old friends.' He says if mother buys a home, go east and buy a home, and still cash this ransom money, and that have some kind of plumber come over to the house and fix the pipe there, in the drain pipe, 'so you can put this changed money away' like he does."

On August 7, 1934, Feldman again came to Denver; Laska arranged for him to stay at a hotel under the assumed name of Axel C. Johnson. Laska also arranged for him to put his car in the private garage of a neighbor. Laska wanted $2,000 of good money which Mrs. Bates had and told Feldman,

" 'Well, remember, kid, neither you or mother owns that money that is buried out in Wyoming. It don't belong to neither of you.' He says, 'My case is worth $50,000.' He says, 'I got that in the Sankey case,' or something like that."

Mrs. Bates testified as to Laska's instructions to her in November as follows:

"He told us to go back to the East, to Philadelphia or New York, Chicago, and get us a home there, and when we got settled we should always communicate with him and keep in touch with him, and remove this money from Cheyenne to the place we was going to buy in, the East, where we were located, and to cache this money, and put it under the sink in a small—he says to get a plumber, and have this plumber fix a place underneath the drain pipe to keep the money in. He says that is the way he got his. He said, 'Don't take it to banks,' told us not to cash any of the money at the gasoline stations if we were in a car, but to go to department stores, grocery stores, the Fair at Chicago, clothing stores, and only to carry a few bills at a time and get small articles, and he says if I didn't take his instructions I would get my throat cut; they would follow us, and to never go back to the Coast. I should forget my children, my friends and my people, and don't associate with anybody. He said if we do as he asked, we would be all right, and if the Federals would get us we should not talk; just do as he says, and we would be all right; 'That money is good.' * * * He said if the Federal men would get me, if I gave myself up, I would get what the Kellys got. I would get life, and if the others found me they would cut my throat; they would cut my throat if I wouldn't tell them where this money was, and I should take his instructions and I would be all right."

There was some corroboration of Feldman's testimony. Laska admitted wiring his associate counsel in Oklahoma City, shortly after Feldman's promise to have $2,000 there in September, that "Bates' friends will have your fee by next Friday or Saturday." But Laska could not remember who "Bates' friends" were and declined to tell who gave him the information on which the telegram was based. In Laska's office was found a message signed "Alex C. Johnson"; Laska disclaimed any knowledge of it. Hotel registers corroborate Feldman's testimony as to his trips to Oklahoma City in September, 1933, and to Denver in August, 1934. Laska's neighbor testified he took his own car out of his own garage in August, 1934, at Laska's request, in order that one of Laska's friends might use it. Laska, while denying knowledge that the Feldmans had buried any money, nevertheless on cross-examination testified:

"I told them they was a type of character that if they knew a man or woman had a dollar, buried, secreted, hid, or anything on them, that they wouldn't stop at anything; they would cut their throats and kill them to get it, and it wouldn't make any difference if I was there with them."

Feldman's testimony was contradicted by Laska, and in part by Mathers, a codefendant, and in part by Molly Edison, a Denver lawyer, who testified that Feldman paid Laska a fee of $3,000 in Laska's office in the presence of Duran. Duran, however, swore to the contrary. Feldman admitted that he gave Laska a false diagram as to where the money was buried, and that he told him Mrs. Bates was in the East, as Laska had directed, when in fact she was in Oregon with her relatives.

Laska categorically denied any knowledge of the ransom money, of knowingly accepting any of it, or of giving any advice concerning it. He testified that in response to Bates' instructions, he asked Feldman to his office; that Feldman was fearful his mother and he would be arrested. Laska testified he told Feldman:

"I says, 'Have they got a picture of you?' He says, 'No.' 'Do they know your name?' He says, 'Yes.' I says, 'Well, then, the only thing you do, to make sure they don't pick you up on some minor offense, like a traffic violation or something, find your name out and put you under investigation and check up on you and get your mother, and your mother has done nothing wrong.'"

That the next day Feldman paid him a fee of $3,000 in currency. Whether that money was deposited in a bank, or placed in a safe deposit box, is not disclosed.

*The Sufficiency of the Evidence.* The principal error assigned is that the trial court should have directed a verdict of acquittal.

If the testimony of Feldman and Mrs. Bates is true, there can be no doubt a crime was committed. It is said that the chief witnesses for the government, having confessed complicity in the offense, were not worthy of belief. Notwithstanding the court's careful charge that accomplice testimony must be received with great caution, twelve qualified jurors accepted their version and rejected Laska's. The trial court approved. In a sense it is incredible that any lawyer would accept blood mon-

ey in compensation for his service as an officer of the court, to say nothing of actively aiding in the accomplishment of this nefarious conspiracy. Yet we know that lawyers do exist who band with criminals and share their loot. The revolting narrative here told is not inherently incredible, and this court is without power, even should it be so disposed, to interfere with the jury's decision on this issue of credibility.

It is argued that to defend a criminal is not to aid him in "escaping detection, apprehension, trial and punishment." A proper defense does not. Even as vicious criminals as Bates and Kelly are entitled to counsel whose function it is to see that all the pertinent facts are brought to the attention of the jury in a fair trial. But no lawyer, in any case, has the right to suggest means of evading apprehension to those who are wanted by the authorities either as witnesses or as defendants. Nor does a lawyer have the right to accept stolen property, or what is worse, ransom money, in payment of a fee. It need not be said that a lawyer has no right to aid in concealing the loot of criminals or to assist them in disposing of it. The privilege to practice law is not a license to steal. Membership in the bar does not mitigate a crime; it aggravates it.

It is claimed there was no proof of any agreement between Laska and the other conspirators; that the original conspiracy terminated when the ransom was collected or when Bates was arrested; that Laska's offense, if any, was of a conspiracy subsequent to the principal conspiracy.

The argument misconceives the charge. The object of the ordinary conspiracy to kidnap is to possess unmarked money which can be spent. The conspiracy begins with the plan to abduct and ends when the ransom money is changed into unmarked money. The study of the victim's fortune, his family, his habits—"fingering"—the abduction, the collection of the ransom, are all but steps leading to the possession of unmarked money or other things of value. The conspiracy continues until the object is attained. Such is the conspiracy here alleged. When Laska entered the conspiracy, efforts to change the ransom money were still going on; Laska aided in that effort in two ways, first by accepting it for his services which in itself is an exchange of the money for a thing of value, and which normally would result in Laska's expenditure of it; and second, by counseling Feldman and Mrs. Bates how to exchange it for good money. By thus entering an active conspiracy, Laska became a member of it. In United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 126, 54 L.Ed. 1168, Mr. Justice Holmes said that if the conspirators "continue such efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success." In this case, the effort to change the marked money was an essential part of the original conspiracy, and that effort had neither succeeded nor been abandoned when Laska entered the scene. In Skelly v. United States (C.C.A.10) 76 F.(2d) 483, certiorari denied 295 U.S. 757, 55 S.Ct. 914, 79 L.Ed. 1699, this court upheld convictions under an indictment almost identical with this, of men in Minnesota who aided Bates in exchanging part of this same ransom. We need not till that ground again. The sentence imposed upon Laska was within the limits imposed by 18 U.S.C.A. § 551.

There was no proof of a formal agreement between Laska and his fellow conspirators. Nor need there be. Conspirators do not reduce their agreements to writing, and seldom is there evidence available of their conferences. Proof of a common understanding may be and nearly always is adduced from circumstances. The Skelly Case, supra, is but one of a myriad of cases so holding. What were the circumstances here? Laska concedes that on the afternoon of August 15 the officers told him that Bates was one of the Urschel kidnapers, and that the officers had taken ransom money from his person. Either the next day or the day after he called Feldman's attention to the Denver Post which carried the same information all over the front page. Laska did not deny having read the story. He told Feldman he knew about the money Bates had left with his wife, told Feldman it was "plenty hot" and to bury it immediately. It cannot be seriously claimed that this is not enough to support the finding that Laska had ample grounds to know that the money was the fruit of the Urschel kidnaping, and to know that a conspiracy existed which would not be fully accomplished until the money was changed. The average man knows that ransom money is generally marked money, and that it is a part of the original plan to change it for unmarked money or things of value. If there were no

fences, there would be little thievery. The jury had a right to believe that Laska, a lawyer with long experience in the criminal courts, knew as much as the average man about crime and criminals. If Laska did as Feldman testifies, and the jury so found, it is a quibble to talk about him not knowing what he was doing. If he did these things, he deliberately entered as black a conspiracy as was ever hatched, and he ought to pay the penalty.

■ The contention is made that it was no crime to receive ransom money until the Act of January 24, 1936, c. 29 (18 U.S.C.A. § 408c—1), and that the court charged the jury that receipt of such money was a criminal offense. Again counsel misconceive the offense charged and the instructions of the court. Laska was not charged with the substantive offense covered by the recent act. He was charged with the conspiracy condemned by the Act of June 22, 1932. The court instructed the jury as to what constituted a conspiracy and that unless they found that Laska became part of that conspiracy, there must be an acquittal. He further instructed that if Laska did so enter the conspiracy, they must further find that Laska either accepted ransom money knowing it was such or aided or abetted Feldman and Mrs. Bates in exchanging it.

■ The trial court rightly denied the motion for an instructed verdict.

*Trial Errors Assigned.* Was Laska accorded a fair trial? The issue was simple: Did Laska, knowing that a conspiracy existed to kidnap Urschel and change the ransom money into unmarked currency, enter that conspiracy by aiding or counseling in the exchange of money and accepting part of it for a fee? A careful reading of the record has persuaded each member of this court that a fair trial of that issue was had. The facts were thoroughly and fairly explored; the exceptions taken at the trial to the court's charge were inconsequential and unfounded. Under these circumstances, we approach the particular errors assigned in the light of section 269 of the Judicial Code (28 U.S. C.A. § 391) which provides that,

"On the hearing of any appeal, certiorari, * * * or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

■ *The Indictment.* It is now claimed that the indictment will not support the judgment, although its sufficiency was not attacked before or at the trial, either by a demurrer or motion for a bill of particulars. The tests of a good indictment laid down in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, and Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861, are (1) whether the indictment apprises the accused of the charges against him with sufficient definiteness to enable him to present his defense, and (2) whether it will protect the accused from further prosecution for the same offense. This indictment unquestionably protects Laska against any other prosecution founded on this conspiracy. Does it meet the first test? Section 332 of the Criminal Code, 18 U.S.C.A. § 550, provides that whoever "aids, abets, counsels, commands, induces, or procures" the commission of an offense "is a principal." Reading the indictment in the light of this statute, Laska was advised that he was charged with participating in the conspiracy by changing the ransom money, or aiding or counseling in changing it, and with receiving $10,000 of it personally. He was thus fully apprised of the charges against him. There is and can be no claim of surprise. The critical evidence went in without objection; Laska was prepared for the issue, for every witness who appears to have figured in the transactions testified, save Laska's secretary who was ill, and her statement was produced. We think the indictment sufficient.

*The Plea in Abatement.* Laska positively verified a plea in abatement in which he alleged that no witness testified before the grand jury to the facts set out in the indictment. Laska could not have personal knowledge of the facts so positively verified, for he was not in the grand jury room. Laska swore it was impossible for Feldman or Mrs. Bates to testify before the grand jury as they did at the trial. He neglected to state why it was impossible. When the plea came on for hearing, Laska had no proof at all to support his sworn plea, but asked to call the members of the grand jury, stating that although he had not talked with them,

"that he would expect them to testify that no evidence was placed before the grand jury showing that Laska was in Oklahoma City at the time Urschel was kidnapped from his home, or that he (Laska) at the time Urschel was kidnapped had any knowledge of the matter whatsoever, or that he assisted in transporting Urschel and holding him for ransom, or that he was present at the time or had anything to do with the payment of the ransom money by the intermediaries to the actual kidnappers."

No one asserts, even now, that Laska was connected with the crime before the ransom was paid. Furthermore, this court held, Cox v. Vaught, 52 F.(2d) 562, that the proceedings before the grand jury may not be explored without some facts, as distinguished from bald conclusions, that rebut the presumption that indictments are returned upon legal evidence. The plea here is frivolous.

*The Newspapers.* Certain pages of the Denver Post, widely circulated in Denver, were introduced to bring home to Laska notice that Bates was charged with the Urschel kidnaping, and that ransom money had been found on his person. These papers carried this information with characteristic prominence. Bates was Laska's client and it is incredible that Laska did not read them; while Laska at one place in his testimony said he had not read the articles, yet when asked when he first knew Bates was wanted in Oklahoma, he testified, "I think the newspapers came out, whether it was the 15th or 16th of August, I am not sure." Feldman testified Laska showed him the first paper. The court carefully limited their probative value to the question of notice, and for that purpose they were admissible. The whole controversy becomes moot when it is remembered that Laska testified the officers gave him the same information the day the first paper came out.

The papers refer to other crimes that Bates was supposed to have committed, and it is said that these references may have inflamed the jury as to Bates. But Bates was not on trial, and besides, the jury had heard from the stand the story of his kidnaping of Urschel and the inhuman treatment to which he was subjected; the newspapers did not paint him blacker than he was or than he was portrayed by the witnesses. The papers carried weather reports, stories of the progress of the N. R. A., and other items immaterial to the inquiry, but likewise not prejudicial.

*The Instructions.* Exception is taken in the brief, for the first time, to two paragraphs of the court's charge to the jury. No exception to these paragraphs was taken at the trial, and the case is not one for this court to notice the error, if any. However, the exceptions now taken are unfounded. From these isolated paragraphs counsel draw the unwarranted conclusion that the court charged the jury that a conviction should follow if ransom money was knowingly accepted by Laska for his fee. This overlooks the first part of the charge where the court instructed carefully as to what constituted a conspiracy, and that Laska could not be convicted unless the jury first found he was a part of the conspiracy as alleged. If the jury did so find, the court said, then they must find whether he had aided and abetted in exchanging the ransom money or had knowingly accepted it in exchange for his services. We pretermit the question of whether a conviction would follow voluntary entry into a going active conspiracy without an overt act on the part of the defendant so entering; certainly the defendant cannot complain if the trial court charged that such overt act must be found before there could be a conviction.

*Other Errors.* The witnesses and lawyers at the trial quite naturally referred to the $90,000 of twenty-dollar marked bills which Urschel paid for his release and which were found in Bates' bag, as ransom money. It was ransom money beyond the shadow of a doubt. The court was careful to say to the jury that the term "ransom" was used as a convenient designation of the bills in the bag, and that calling it so did not make it so. If new trials must be awarded because witnesses speak naturally while on the stand, the effort to punish criminals might as well be abandoned.

In his address to the jury counsel for Laska argued that the Feldmans testified falsely with the hope that leniency would be extended them in the matter of sentences on their plea of guilty. But counsel did not stop there. He undertook to tell the jury that their sentences had been postponed by the court in order, presumably, to influence their testimony. Whereupon the court properly and prompt-

680

ly stopped him and said sentence had been deferred until the law was settled on another appeal. Counsel had the right to argue that the witnesses' testimony was influenced by their hope of reward, but no right to go outside the record to speculate as to the reasons why sentence had been deferred by the court.

Appellant's guilt or innocence turns upon a pure question of credibility. That question was determined by a jury after a careful and fair trial. The judgment is therefore affirmed.