**McDONALD v. UNITED STATES.\***
**No. 10587.**

Circuit Court of Appeals, Eighth Circuit.
March 6, 1937.

Rehearing Denied March 26, 1937.

*Writ of certiorari denied 57 S.Ct. 925, 81 L.Ed. ——.

130

William L. Vandeventer, of Springfield, Mo. (Everett Jennings and Edward M. Keating, both of Chicago, Ill., on the brief), for appellant.

George F. Sullivan, U. S. Atty., of St. Paul, Minn. (George A. Heisey, Asst. U.

S. Atty., of St. Paul, Minn., on the brief), for the United States.

Before GARDNER, THOMAS, and FARIS, Circuit Judges.

FARIS, Circuit Judge.

Appellant was indicted jointly with ten others for the violation of section 408c, title 18, U.S.C.A., for that he had conspired with such other ten (and two other persons, who died prior to the finding of the indictment) to kidnap, transport interstate and hold for ransom, one Edward George Bremer. Section 408a, title 18, U.S.C.A. Appellant was tried jointly with two other of his co-indictees. He was found guilty and his punishment fixed at imprisonment in a penitentiary for the term of fifteen years. He has appealed, as by rule provided.

Specifically, the overt acts charged against appellant were (as the indictment set out and the evidence showed) that he had on September 2, 5, 9, and 10, 1934, at Miami, Florida, and Havana, Cuba, knowingly done acts to further the exchange and had exchanged some $92,000 of marked money, which had been paid as a ransom, or reward to his coconspirators for the release of Edward George Bremer, in exchange for unmarked money.

Bremer, the person kidnaped, had been seized by certain of the conspirators jointly indicted with appellant (who was not personally present) at St. Paul, Minnesota, on January 17, 1934, and had been thence transported by them to Bensenville, in the State of Illinois; had at the latter place been detained as a prisoner for some two weeks, pending negotiations for his release upon payment of ransom money, and had been thence transported back to the State of Minnesota, to a point near Rochester in that state, whereat he was released on payment to the actual kidnapers, or to some of them, of the sum of $200,000 in cash, which was "marked" (so called), or the numbers, denominations, and banks of issue listed. The release of Bremer, and the payment of the ransom, in marked money occurred on February 6, 1934; while, as already said, the overt acts charged against appellant occurred on and between September 2 and September 10, 1934. The first mention in the evidence of appellant's connection with the case (as one living in Detroit, Michigan, who, as soon as he could go to Cuba, would for a commission of 25 per cent. exchange the ransom money for unmarked money) occurred late in June, 1934. Appellant, from his own statement, was at that time a resident of Detroit; his principal business consisted of "gambling activities in Chicago, Detroit and Havana, Cuba." He had for some ten years, in connection with such "activities," been on occasions a visitor in Havana and as a result of such visits he "managed to control gambling in Havana."

The money paid for the release of Bremer consisted wholly of small bills, namely, fives and tens. Appellant's co-indictees had so stipulated in divers ransom notes to the kin and friends of Bremer. They also insisted that it should not be "hot," that is, marked; otherwise they would not accept it, or release Bremer. But as the record discloses, they did accept it, expecting that it would be marked, and of course, it was marked. They relied on their ability to discover markings on it; but either their ability failed them or their cupidity overcame them. The whole sum largely intact, till July, 1934, was traced from one point to another in the hands of divers of the actual kidnapers to various States, till some $92,000 of it was found to have been exchanged by appellant, at Havana, Cuba, for large bills of unmarked money, in the early days of September, 1934. Theretofore, a part of this ransom money had been exchanged for unmarked money in Chicago, with the result that one McLaughlin was arrested therefor.

Appellant was tried jointly with Weaver and Sawyer, both of whom are shown by the record to have been in the conspiracy to kidnap Bremer from the formation thereof. The latter two were also found guilty, and Sawyer has appealed on a joint record with appellant. Except appellant, all ten of his co-indictees are charged with active participation in the act of kidnaping Bremer and holding him for ransom, and with having been connected with the conspiracy from its incipiency. Appellant alone, of the eleven, has guilt attributed to him perforce the fact that he came into the case some four months or a little more after the ransom money was paid and Bremer released, and for the sole purpose of exchanging the marked ransom money for unmarked money, which could be spent safely by his co-indictees. About the latter fact and its

legal implications, the instant appeal largely rages. At the time of the trial below of these co-indictees, Arthur Barker, Harold Alderton, James Wilson, Volney Davis, and Elmer Farmer had been arrested, either tried and convicted, or had pleaded guilty and were in prison; Alvin Karpis and seemingly Harry Campbell were then fugitives from justice; Byron Bolton had pleaded guilty, but had, as the vernacular puts it, "turned state's evidence," that is, testified for the appellee herein, and his sentence had not then been fixed; William J. Harrison had died after he had been indicted; and George Goetz and Fred Barker had died before the indictment was returned.

Numerous assignments of alleged errors are made in the record; but of such, five only have been urged upon us in argument. These are: (a) That appellant could not be legally prosecuted or found guilty of a conspiracy under section 408c, supra, to violate the provisions of section 408a, supra, because the conspiracy, if any, was fully consummated and had ended upon the payment of the ransom money and the release of Bremer, on February 6, 1934, and so the acts of appellant, if any, in and about the exchange of marked ransom money for unmarked money, occurring subsequent to February 6, 1934, are not within the denouncement of the statute on which appellant was tried and convicted; (b) that the court erred in admitting in evidence conversations, exhibits, and papers had and coming into existence after the payment of the ransom money and the release of Bremer; (c) that the court erred in permitting handcuffs to be put on and kept on Weaver (jointly tried with appellant) during the trial, and denying to appellant a severance and a trial separate and apart from his codefendants Weaver and Sawyer; (d) that it was error to admit secondary evidence of the numbers, indicia of identification, and physical condition of certain money found in the National City Bank in Havana, in the face of the record which showed that this money had been called in and destroyed under orders of the Treasury Department of the United States; and (e) that the court erred in refusing to charge the jury to acquit the appellant.

The contention that the conspiracy charged in the indictment, and any conspiracy under section 408c, supra, ends upon the payment of the ransom and the release of the victim, is raised on this instant record in many ways and in well-nigh every mode known to the law. The first overt act charged against appellant in the indictment, and shown by the evidence, took place on September 2, 1934, or seven months, lacking four days, after the ransom was paid and Bremer released. He had agreed, however, some time in June, 1934, to exchange this money in consideration of a large commission, and by such agreement he became a member of the conspiracy, if it still existed. The contention of the nonexistence of the conspiracy, perforce consummation thereof prior to September, 1934, includes the argument stressed herein by appellant that section 408a, supra, neither by its language nor intendment includes within the scope of its criminal denunciation the exchange of marked ransom money for unmarked money; that it merely forbids and punishes the transportation interstate and in foreign commerce, by both principals and accessories before the fact, of persons who have been kidnaped and are being held for ransom or reward, and so much and no more is all that is forbidden and punished by it. Thus in brief runs the contention of appellant.

Section 408a, title 18, U.S.C. (18 U.S.C.A. § 408a), defines and denounces as a crime the transportation across a state line or a national boundary of a person who has been kidnaped and is being held for ransom. Section 408c, title 18, U.S. C. (18 U.S.C.A. § 408c) (of the original act) denounces as a crime and punishes the entering by two or more persons "into an agreement, confederation, or conspiracy to violate the provisions of sections 408a and 408b of this title" and the doing of "any overt act toward carrying out such unlawful agreement, confederation, or conspiracy." As said already, appellant was indicted and convicted for violating the conspiracy clause of section 408c, which in substance we quote above. The second clause of section 408c, title 18, U.S.C., added by the amendment of January 24, 1936 (18 U.S.C.A. § 408c—1), does not apply to appellant, because he was not indicted under it and because it was added to the act subsequent to the commission by the appellant of the acts and things with which he stands charged.

So, its provisions are not relevant to anything in the case at bar, save as the basis of an able argument by appellant's learned counsel, to which some discussion hereinafter will be directed.

The sections referred to, define two crimes: First, the transportation in interstate commerce of a person who has been kidnaped and is being held for ransom; and, second, a conspiracy to commit the crime first above mentioned. We are here directly concerned only with the conspiracy. That upon the record, the substantive crime defined and denounced by section 408a, supra, was committed by Weaver, Barker, Karpis, Goetz, or others jointly indicted with appellant, can neither be denied nor successfully questioned. That these or other co-indictees of appellant captured Bremer, in the State of Minnesota, took him to the State of Illinois, held him a prisoner there from January 17, 1934, to February 6, 1934, and then on February 6, 1934, brought him back to the State of Minnesota and released him, on payment of a ransom of $200,000 in marked or listed currency of five and ten dollar denominations, none reading the record before us would be so hardy as to deny. Indeed, as said, several of those taking part in the seizure, detention, and release of Bremer for a ransom entered pleas of guilty to the charge of conspiracy.

Certain rules which apply to the crime of conspiracy have become so well-settled as not to require exposition or citation of authority. These are: (a) That a person may be convicted of a conspiracy to commit a defined substantive offense against the law, even though such latter offense be actually and entirely consummated; (b) that a person who knowingly enters into a conspiracy after its formation, but before it is ended, is equally as guilty as are those who were in it at its formation; and (c) that a criminal conspiracy once formed continues until the object of it has been accomplished unless abandoned short of an overt act, or broken up by the arrest of the participants. While the case at bar rests upon a special conspiracy statute and not on section 88, title 18, U.S.C. (18 U.S.C.A. § 88), it is well-settled that, when a statute uses words whose meaning under judicial decisions has become well-known and well-settled, it will be presumed that the Legislature used such words in the sense justified by long judicial sanction. Kepner v. United States, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114, 1 Ann.Cas. 655.

Though appellant himself did no overt act till the early days of September, 1934, the evidence warranted the jury in finding that he came into the conspiracy as early as June, 1934, and at a time when the ransom money except as to a small part thereof had not been divided or "cut up" among the conspirators, because of their fear that a division of it till it had been exchanged would lead to detection and their arrest and conviction. As said, a settled rule of law admonishes us that a criminal conspiracy, once formed, continues till the object, for which it was formed, has been accomplished. What was the object to be attained by the capture and detention of Bremer? Clearly, it was not for the mere pleasure of his company at the "hide-out" over in Illinois, or in moonlight joy rides back and forward across the Illinois, Wisconsin, and Minnesota boundaries. But as in almost all cases which fall under the ban of the statute, the seizure and detention of Bremer was for the purpose, therefore with the object, of illicit gain. Such gain, in order to be usable for the sustenance, pleasures, and vices of the conspirators, had to be in a form to be used by them without danger of detection and arrest. The record is replete with facts and circumstances showing that the ransom money was listed or marked, that the conspirators expected it to be marked, and after it came into their hands, knew it was marked, and so knowingly engaged appellant to exchange it for unmarked money. The brief of appellant as to the two last points argues contrariwise and bases the argument on ransom letters of the kidnapers, but these letters, which spell ignorance to counsel, spell knowledge to us.

The phase of the rule of law here involved, namely that a continuing conspiracy ends only upon the accomplishment of the object thereof, is settled as a rule of decision. No general rule of law can be accurately laid down touching when accomplishment has been achieved. It follows that the latter question therefore is one well-nigh wholly of fact to be resolved by common sense and human observation and experience, and largely each category must be weighed in its own facts.

■ But if a court should be so hardy as to attempt to formulate a general rule as to when a continuing criminal conspiracy, having for its object illicit gain, is at an end, it might well run somewhat thus: Whenever the unlawful object of the conspiracy has reached that stage of consummation, whereat the several conspirators having taken in spendable form their several agreed parts of the spoils, may go their several ways, without the necessity of further acts or consultation, about the conspiracy, with each other or among themselves, the conspiracy has ended.

Numerous cases in both state and federal jurisdiction seem to us to fully justify the view taken and suggested. See Rettich v. United States (C.C.A.) 84 F. (2d) 118; Bellande v. United States (C. C.A.) 25 F.(2d) 1; Murray v. United States (C.C.A.) 10 F.(2d) 409; United States v. McGuire (C.C.A.) 64 F.(2d) 485; Laska v. United States (C.C.A.) 82 F.(2d) 672, 677; Skelly v. United States (C.C.A.) 76 F.(2d) 483; Shannon v. United States (C.C.A.) 76 F.(2d) 490; Lew Moy v. United States (C.C.A.) 237 F. 50; Coates v. United States (C.C.A.) 59 F.(2d) 173, 174; People v. Storrs, 207 N.Y. 147, 100 N.E. 730, 45 L.R.A.(N.S.) 860, Ann.Cas.1914C, 196; State v. Thaden, 43 Minn. 253, 45 N.W. 447; Baker v. State, 80 Wis. 416, 50 N.W. 518; State v. Pratt, 121 Mo. 566, 26 S.W. 556; Commonwealth v. Stuart, 207 Mass. 563, 93 N.E. 825; O'Brien v. State, 69 Neb. 691, 96 N.W. 649; Lincoln v. Claflin, 7 Wall. 132, 19 L.Ed. 106.

■ The cases of Laska v. United States, supra, and Skelly v. United States, supra, are wholly similar to the case at bar. There, as here, the indictment was under section 408c, title 18, U.S.C. (18 U.S.C. A. § 408c), as it read prior to the amendment of January 24, 1936 (18 U.S.C.A. § 408c—1); there, as here, the accused therein was not a party to the original conspiracy, but only came into it after payment of the ransom and the release of the victim and took part in exchanging marked ransom money for unmarked money; and there, as here, the indictment was drawn so as to charge such fact aptly and to charge a continuing criminal conspiracy surviving till after the making of the exchange. Nothing is clearer than that the latter two cases are squarely in favor of the view that the conspiracy in the instant case had not ended, when in Sep-

tember, 1934, appellant committed the overt acts charged against him. For in each of those cases the precise contentions urged in the case at bar were urged by the appellants therein; but the court disallowed these contentions and held that a conspiracy under section 408c, supra, to violate the provisions of section 408a, supra, did not end till the marked money paid as ransom had been exchanged for unmarked money.

■ There is a rule of appellate practice which makes it the duty of one Federal Circuit Court of Appeals to follow the decisions of other such federal courts, unless it shall plainly appear to the court last considering the question, that the ruling formerly made is erroneous. Shreve v. Cheesman (C.C.A.) 69 F. 785, 790; Commercial Union of America, Inc., v. Anglo-South American Bank (C.C.A.) 10 F.(2d) 937. Indeed, the language of Judge Sanborn in the Shreve Case, supra, is even stronger in stating the duty to follow, than we have indicated; for he says: "A deliberate decision of a question of law by one of these courts is generally treated as a controlling precedent in every federal circuit court in the Union, until it is reversed or modified by an appellate court."

■ But it is contended by appellant that the legislative history of the amendment of January 24, 1936, to section 408c title 18, U.S.C., clearly shows that both the Congress and the Attorney General were of opinion that the language of sections 408a and 408c, as the latter read before such amendment, was not legally adequate to support a prosecution for conspiracy to kidnap, transport interstate, and hold for ransom in a case wherein, as here, the accused came into the conspiracy after the ransom money had been paid and the victim released, and when the only overt act of the accused had been to exchange marked ransom money for unmarked money. And as a legal proposition appellant urges that this court is concluded by, and is therefore bound to follow, the views of the Congress and the Attorney General, in reaching an opinion touching what was included and what was excluded in the criminal coverage of section 408c, supra, before it was amended. This contention of appellant includes too much. There are situations, it is true, involving the construction of ambiguous

language in a statute, wherein resort to the congressional history of a statute may throw light on its meaning. This light courts may in a proper case resort to, but resort ordinarily to such history is not permissible save to solve ambiguity as to congressional intent. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168. The contention as made, fails to take into consideration the fact that by the act under discussion here, the popularly named Lindbergh Act, nothing and no principle was added to the well-settled law of criminal conspiracies. All the act did in final analysis was to graft on to this existing law a provision as to interstate transportation, or so-called interstate commerce, in an effort to justify constitutionality, not herein attacked. It is, of course, idle to urge that federal courts are bound to follow the views or opinions as to the law held and expressed by the Attorney General. Such are persuasive and such deference should be accorded to them as is given to the opinions of other able persons learned in the law, e. g. Wigmore, Parsons, Bishop, Story, Greenleaf, and others, but no more. This for the reason, inter alia, that his office is to be allocated to the executive and not to the judicial branch of government.

It follows that we agree in principle with the view expressed in a precisely similar case in disposing of a precisely similar contention. In the Laska Case, supra, the Circuit Court of Appeals of the Tenth Circuit said: "The object of the ordinary conspiracy to kidnap is to possess unmarked money which can be spent. The conspiracy begins with the plan to abduct and ends when the ransom money is changed into unmarked money. * * * The conspiracy continues until the object is attained."

It is obvious that the view thus taken disposes of appellant's contention that the trial court erred in admitting in evidence acts done and conversations and statements had and made by appellant's co-indictees, as also physical exhibits and documents coming into existence subsequent to the payment of the ransom money and the release of Bremer. For, as already indicated, nothing is better settled as a rule of law than that while the conspiracy continues the acts and statements of one conspirator are binding on all. Rettich v. United States, supra.

The case of France v. United States, 164 U.S. 676, 17 S.Ct. 219, 41 L.Ed. 595, is strongly relied on by appellant as decisive of the case at bar. We are not convinced that the France Case constrains us and requires a reversal. In its simplest terms defendant therein and others were prosecuted and convicted for a criminal conspiracy, for that they had conspired to transport lottery tickets in interstate commerce. On the trial it was shown that no tickets had been so transported, but that what had been transported were lists of winning numbers in a lottery, drawn in another state, and so it was held by the Supreme Court that the statute did not cover what had been done by the defendants therein; because, since winning lists were not tickets, the transportation of such lists did not constitute an overt act, toward carrying out a conspiracy to violate the criminal statute there involved, which was the Act of March 2, 1895, c. 191, 28 Stat. 963 (18 U.S.C.A. § 387 and note).

We think the facts in the case at bar are clearly distinguishable from those in the France Case. Under the latter case, it is clear that had the prosecution been for a violation of the substantive crime denounced by the act, no one of the defendants in the France Case could have been convicted. Here no such legal situation exists. For there is no doubt that under the indictment in the case at bar those who actually seized Bremer, transported him interstate and held him for ransom were guilty of violating section 408a, supra. Nor hardly can it be urged that such seizure, transportation, and holding would not constitute overt acts toward consummation of the conspiracy denounced by section 408c, supra. So, if the doctrine of the France Case shall be applied in a thorough-going way to the case at bar, none of the actual perpetrators of the substantive crime here under discussion could be successfully prosecuted under either section 408a or 408c, supra. In short, in the France Case no one of those indicted had violated the provisions of the Act of March 2, 1895, c. 191, 28 Stat. 963, or those of the statute denouncing criminal conspiracy; here each and every one of appellant's co-indictees (arguendo, except appellant,) had violated sections 408a and 408c, both supra. And whether

appellant did so depends only on whether the conspiracy here was a continuing one, which subsisted till the marked ransom money had been exchanged for money which could be safely used by the conspirators. This view accentuates and lends support to the notion already forecast, that a question of fact rather than a question of law is involved. Expressed in still another way: France could not be convicted for a conspiracy to violate a statute which had no application to what neither he nor his co-indictees conspired to do and actually did. Here there was an applicable statute, clearly applying, at least to all indicted conspirators except appellant, and we conclude it applied also to him.

Error is urged by appellant bottomed upon the facts that he was denied a severance and tried jointly with Sawyer and Weaver, and that the latter was, shortly after the trial began and during the trial, handcuffed in the presence of the jury. The two acts set out in the assignment are coupled together, no doubt to accentuate the enormity of the court's action. But on the matter of a denial of a severance and a separate trial to one of two or more accused persons who have been jointly indicted, this court and all other federal courts have said over and over again that denial of a separate trial is a matter resting in the sound judicial discretion of the trial court, and absent an abuse of such discretion, such denial will not constitute reversible error. Russell v. United States (C.C.A.) 86 F.(2d) 389. No sufficiently harmful conflict of interest or evidence is pointed out in appellant's motion for a separate trial. Cochran v. United States (C.C.A.) 41 F. (2d) 193. In fact, the entire record discloses no such conflict as could possibly have worked harm to appellant's interests or damaged his defense. Appellant could not successfully demand a separate trial, because an unfavorable atmosphere might be created by the presence on the trial of a codefendant or codefendants. Soblowski v. United States (C.C.A.) 271 F. 294, 295. The rule that an abuse of discretion in refusing a separate trial must be made to appear before such refusal shall constitute hurtful error, existed long prior to the amendment in 1919, of the Statute of Jeofails (28 U.S.C.A. § 391). Lee Dock v. United States (C.C.A.) 224 F. 431. The above statute as amended and as it now reads (section 391, title 28 U.S.C.A.), adds force to the long existing rule.

The contention that appellant was prejudiced before the trial jury and hurt in his defense by the fact that Weaver, jointly tried with him, was handcuffed while the trial proceeded, deserves, we think, short shrift. Even if appellant, as he was not, had been handcuffed, something more than the mere fact would have to be shown by the record before error may be bottomed on it. It is too obvious for argument that hardly any other matter can better be relegated to the discretion of the trial court than that of safeguarding the court, counsel, jury, and spectators, and assuring the continued presence and attendance of the accused at the trial. Absent incontrovertible evidence of hurt, the trial court should be permitted to use such means, to secure the named ends, as the nature of the case, the known criminal record, character, associates in crime, and reputation of the accused shall reasonably call for, and such is the rule enunciated in the few cases existing which deal with the question, even when raised by one who had been himself handcuffed on his trial [Lias v. United States (C.C.A.) 51 F.(2d) 215, 217; State v. Brewer, 218 Iowa, 1287, 254 N.W. 834, 840; Pierpoint v. State, 49 Ohio App. 77, 195 N.E. 264; Commonwealth v. Millen, 289 Mass. 441, 194 N.E. 463]; a fortiori, should this be the rule when not the appellant, but only a codefendant was shackled.

In the course of the trial it was shown that all but some $12,760 ransom money of the $92,000 exchanged by appellant in Havana had been scattered in circulation by the City National Bank and the Cuban National Treasury. Shortly after this sum of $12,760 was discovered and identified, such steps were taken by the United States Treasury Department as resulted in the calling in of this money and destroying it by maceration, and the issuance of new money in lieu thereof. Thus it became necessary for the government to use secondary evidence in order to identify it by listed numbers, denominations, and banks of issue, as being a part of the ransom money. This the trial court permitted to be done, and appellant urges that in doing so he committed error. It is to be conceded, of course, that the best evidence extant and obtainable must be

used in the trial of a lawsuit, and that secondary evidence of a fact may not be offered so long as primary evidence is extant and obtainable. So, what was permitted did not violate this fundamental rule; because while, until destroyed, this money was extant, it was not obtainable by any process of the trial court. But appellant contends that the United States was the plaintiff here, and that since a department of the United States, namely, the Treasury Department, obtained as an act of grace and destroyed this $12,760, the United States, as plaintiff herein, should not have been permitted to put in secondary evidence as to the denominations, numbers, banks of issue, or other earmarks and indicia, to identify it as a part of the ransom money.

■■■■ We think that in thus admitting secondary evidence, the trial court did not err. Confessedly the money itself when this case was tried, no longer existed and the use of it as evidence was impossible, and this fact constituted a sufficient foundation for the introduction of secondary evidence. Hartzell v. United States (C.C. A.) 72 F.(2d) 569. Cases may possibly be found which hold that a proper foundation for the admission of secondary evidence of papers and documents which have been destroyed, includes among its elements a showing that destruction was not caused by the voluntary act of the *party* who subsequently proffers secondary evidence of the contents of such documents. But that rule has no application here for many reasons. Among these are that the money belonged to the City National Bank of Havana, Cuba, and was when discovered physically in that foreign country and beyond the process and jurisdiction of the court in which this case was tried. This was of itself a sufficient reason for secondary evidence (Hartzell v. United States, supra), and so, its subsequent obtention and destruction by the Treasury Department of the United States had no vital bearing on the legal necessity for a resort to secondary evidence. Such resort would have been both necessary and legally warranted, if this money had never been obtained, as it was perforce the grace of the foreign owner, and if it had never been destroyed.

■■■■ The witness McKee, who testified for the government, obtained this money by negotiation with the foreign owner, and under orders from the head of his bureau, took such steps as were necessary to have the money called in and maccrated by the Treasury Department. McKee did not act of his own volition, but under orders from his superior, who was not a witness in the case. Whether McKee or his bureau chief shall be regarded as the destroyer in the case, neither of them was a party to this case nor had any personal interest in the matter. While it is to be conceded that an unfavorable inference arises in the trial of a lawsuit against a *party* who destroys primary evidence, the penalties and the odium are personal (22 C.J. 109; 2 Chamberlayne on Evidence, 1078a,), and the extreme penalty of refusing to admit secondary evidence, of a fact or facts vital to the prosecution here, ought not to be inflicted because of the bad judgment of a minor official, or a bureau of the government.

■■■■ Again, the rule is that the reason for the destruction may be explained. Berthold-Jennings Lumber Co. v. St. Louis, I. M. & S. R. Co. (C.C.A.) 80 F. (2d) 32, 42, 102 A.L.R. 688; Mastin v. Noble (C.C.A.) 157 F. 506; 2 Chamberlayne on Evidence, 1078a. Here there was no "intentional conduct indicating fraud and a desire to destroy, and thereby suppress, the truth" (Berthold Case, supra) but the reason for the destruction is so obvious as hardly to require statement; but it was that the possession of a single bill of this marked ransom money constituted a continuing menace to the liberty, peace, and reputation of any person into whose hands it might fall. So, the court below charged upon the point that "whether or not some government official exercised the best judgment in ordering the destruction of these bills is not a matter that should enter into your deliberations, except in so far as the conduct of any government official may have bearing upon the weight you should attach to this secondary evidence." In doing this, the authorities we cite above clearly prove that the court below accorded to appellant more than was due him under the law and the situation. It must be conceded that having got this money into the control of a government bureau, the destruction of it was improvident and ill-considered, pending or prior to a trial of those accused of dealing with it. But no case will be found wherein a *party* to a lawsuit has been penalized to

the extent here urged by appellant, because a mere witness caused the destruction of primary evidence under the situation disclosed by the record here. Back of the harsh rule contended for by appellant—if indeed this rule has not been outmoded or modified (22 C.J. 109)—lies the doctrine of estoppel, and ordinarily the United States cannot be estopped by the acts of its subordinate officials and agents. Wisconsin Railway Co. v. United States, 164 U.S. 190, 210, 17 S.Ct. 45, 41 L.Ed. 399; The Floyd Acceptancès, 7 Wall. 666, 19 L.Ed. 169. But we think a better answer to this somewhat unique contention of appellant is that no court ought so far to stultify itself as to hold that the United States may be estopped, precluded, hindered, or thwarted in its sovereign duty to prosecute for crimes by the fact that a subordinate official or one among its many bureaus, disregarding co-ordination, saw fit in pais to do an unwise, hasty, unnecessary, and improvident act. The only exceptions, if in fact they are such, are entrapment, and unlawful search and seizure. See Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249.

The sufficiency of the evidence to take the case to the jury is assailed in divers ways. These assaults are bottomed mainly on two contentions: First, that the evidence is not sufficient to show that when appellant exchanged the marked ransom money for unmarked money, if he did so, he had knowledge that it was a part of the Bremer ransom money; and, second, that the identification of the money found in the bank in Havana fell short of showing that it was a part of the money exchanged by appellant for bills of larger denominations.

■ Contact of appellant with his co-indictees and the original conspirators is shown as early as June, 1934. It was for the jury to say whether he was the man in Detroit, who, as soon as he could go to Havana, as he admitted he did, would exchange the marked ransom money, and having found this fact from subsequent circumstances and the acts of appellant, to infer that the services of appellant had been secured through personal contact.

■ Moreover, he is shown to have been in close association with Sawyer and Harrison in Miami. He went from Detroit to Miami and Havana, to which latter place he made several trips, within the space of a few days. He had a suite in a hotel at Miami with Harrison, one of the original conspirators (for identity of name creates a presumption of identity of person) who went with him on one trip to Havana. In making the exchanges of the money in question he went under an assumed name. He first exchanged $20,-000 in small bills for $11,000 in gold, and paid therefor an exorbitant commission to a sort of curbstone brokers. In a day or two thereafter, he exchanged this gold for bills of United States currency, of large denomination; again paying a large commission to these brokers. Shortly afterwards, he exchanged $72,000 in five and ten dollar denominations (to which he added a few twenty-dollar bills to obviate suspicion) for bills of large denominations. In his voluntary statement, he said he got this gold from one Jiminez, called the Chinaman, with whom he had theretofore deposited it for safekeeping, and that in all he had exchanged only some $30,000 of small bills for larger denominations; whereas, as shown by other witnesses, wholly unimpeached, he had in all exchanged $92,000 in small bills for large bills, and had bought the gold with small bills and then sold it again. Of these small bills $12,760 were shown to have been marked ransom money. The triers of fact had the right to consider on the question of his knowledge any false statements he made in his attempted explanation. State v. Concelia, 250 Mo. 411, 157 S.W. 778. Taking these things and others shown by the record, we think it is idle to contend that appellant did not know that he was exchanging "hot" money, for money without temperature. His association with Sawyer and Harrison, and other of the original conspirators warranted the jury in reaching the conclusion that he knew whence the "hotness" of this money came. A conspiracy was clearly shown by the evidence and the actions of appellant constituted circumstances consistent with guilt and wholly inconsistent with any reasonable theory of his innocence. This court said in the very recent case of Galatas v. United States, 80 F.(2d) 15, 23, 24, this: " 'It is enough if a man, understanding that there is a crowd banded together to break the law, knowing in a general way what the purposes of the crowd are in that respect, becomes a member of it and acts with them to a greater or lesser extent.' " And, also, we said in that case: "Where a con-

spiracy is established, but slight evidence connecting a defendant therewith may still be substantial, and if so, sufficient."

The identification of the $12,760, as being a part of the $72,000 in small bills exchanged by appellant for large bills, largely was bottomed on a peculiar darkish gray stain which was apparent on the edge of the bills when they were in packages. One witness was positive of his identification on account of this peculiar stain, and also from the bands which were around the packages of bills when they were gotten back from the City National Bank of Havana, which were the same as were on the bills when they passed through the hands of the same witness in September, 1934. This testimony was not so improbable as to require the court to say that it was incredible as a matter of law. So, it was for the jury. Flowers v. United States (C.C.A.) 83 F. (2d) 78, 81. Besides, this money was United States money being handled and dealt with in a bank in a foreign country, from which fact the jury were warranted in assuming, may well have caused the witness to pay a greater degree of attention to it than would have been given to money of the vicinage.

Other contentions are made by appellant, but all such are fairly included in what has been said already.

The case should be affirmed, and this we order.